[No. B060501. Second Dist., Div. Three. Dec. 22, 1992.]

ROBERT COLVIN, a Minor, etc., et al., Plaintiffs and Appellants, v. CITY OF GARDENA et al., Defendants and Respondents.

COUNSEL

Michael J. Piuze, Frank D. Polito and John Keiser for Plaintiffs and Appellants.

Nelson, Draper & Teuber and Bruce L. Nelson for Defendants and Respondents.

Rutan & Tucker, Philip D. Kohn, City Attorney (Laguna Beach), Hans Van Ligten, Assistant City Attorney, Mayer & Reeves, Thomas M. Reeves, Martin J. Mayer and Michael J. Karger, City Attorney (Gardena), as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**KLEIN, P. J.**—Plaintiff and appellant Robert Colvin, a minor, by and through his guardian ad litem, Alice Allen (hereafter, Colvin), appeals a judgment following a grant of summary judgment in a wrongful death action in favor of defendants and respondents City of Gardena (the City or Gardena), Gardena Police Department (the Department), and officers Steven Swain, Blane Schmidt, and Mark Batungbacal (the officer defendants) (sometimes collectively referred to as the Gardena defendants).

The essential issue presented is whether the City's written policy on vehicular pursuits met statutory requirements so as to confer immunity upon the City.

Because the policy fails to specify minimum standards and adequate guidelines as required by Vehicle Code section 17004.7, subdivisions (c)(2) and (c)(4),[1] the judgment is reversed as to the City. Because the officer defendants are immune under section 17004, the judgment is affirmed as to them.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 13, 1988, Colvin's father, Bobby Colvin, was killed when the vehicle Bobby Colvin was driving was struck by a 1972 Buick driven by Shawn Wilson (Shawn), a nine-year-old boy, who had taken his parents' vehicle. Prior to the collision, Shawn had been pursued by two police cars for about three miles, through several red lights, at speeds approaching 100 m.p.h.

Colvin filed this wrongful death action against Shawn, Shawn's parents, and the Gardena defendants, alleging negligence by Shawn and his parents and negligence and recklessness by the City and its employees.[2]

The Gardena defendants answered, denied the allegations, and asserted various affirmative defenses, including immunity pursuant to sections 17004 and 17004.7.[3]

The Gardena defendants then moved for summary judgment on the ground they were immune from liability for any police pursuit activity. The moving papers included a copy of a four-page directive issued by Gardena's chief of police pertaining to pursuit driving by its police officers (hereafter, the directive or the policy).[4]

In opposing summary judgment, Colvin argued, inter alia, the policy failed to conform to section 17004.7, and further, the officers involved in the pursuit were not aware of the policy's existence.

---

[1] All further statutory references are to the Vehicle Code unless otherwise specified.

[2] Shawn and his parents are not parties to this appeal.

[3] Section 17004 confers immunity upon *public employees* for injury or death resulting from the operation, in the line of duty, of an authorized emergency vehicle while responding to an emergency call or in the pursuit of an actual or suspected violator of the law.

Section 17004.7 provides immunity to *public agencies* employing peace officers which adopt a written policy on vehicular pursuits if the adopted policy meets statutory requirements.

[4] Exhibit A to this opinion is a copy of the City's policy.

Colvin's opposition papers also included a copy of the Perris Police Department's pursuit policy. That policy, which was markedly similar to Gardena's, had been found inadequate by a trial court in Riverside.[5]

The City filed supplemental papers, including a copy of the pursuit policy which had been adopted by the San Diego City Council. The City argued the San Diego policy demonstrated "remarkable similarities" to its own policy.[6]

The matter was heard and was taken under submission. On July 15, 1991, the trial court granted summary judgment in favor of all the City defendants. The order cited sections 17004 and 17004.7 and stated the defendants "had . . . adopted the Policy of Vehicular Pursuit, which complied with . . . [section] 17004.7."

This appeal followed.

## CONTENTIONS

Colvin contends the trial court's determination of immunity was error because (1) the directive fails to conform to the requirements of section 17004.7; (2) the police chief's issuance of the directive did not amount to the adoption of a vehicular pursuit policy by the City within the meaning of section 17004.7; and (3) immunity does not arise because the directive was never implemented or disseminated to the officers who were unaware of its existence.

The City reiterates the argument it made before the trial court.

## DISCUSSION

1. *Standard of appellate review on summary judgment.*

■ The purpose of the summary judgment procedure is not to try the issues but merely to discover, through the medium of affidavits, whether there are issues to be tried and whether the parties possess evidence which demands the analysis of trial. (*Saporta* v. *Barbagelata* (1963) 220 Cal.App.2d 463, 468 [33 Cal.Rptr. 661]; *Orser* v. *George* (1967) 252 Cal.App.2d 660, 669 [60 Cal.Rptr. 708].)

■ A defendant moving for summary judgment has the burden of establishing a complete defense or negating each of the plaintiff's theories and

---

[5]An appeal in that action, *Payne* v. *City of Perris* (E010418),* is currently pending in the Fourth District. (Evid. Code, §§ 452, subd. (d), 459.)

[6]Exhibit B to this opinion is a copy of the San Diego vehicular pursuit policy.

*Reporter's Note: *Payne* v. *City of Perris* (1993) 12 Cal.App.4th 1738, filed February 1, 1993.

establishing the action is without merit. (*Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 666 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]; *Bonus-Built, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].)

■ Because the trial court's ruling on a motion for summary judgment is one of law based upon the papers presented, the appellate court makes an independent determination of their construction and effect. (*Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 496 [86 Cal.Rptr. 744]; *Bonus-Built, Inc.* v. *United Grocers, Ltd., supra*, 136 Cal.App.3d at p. 442; *Hayman* v. *Block* (1986) 176 Cal.App.3d 629, 640 [222 Cal.Rptr. 293].)

2. *Trial court properly held the officer defendants enjoy immunity.*

■ While Colvin seeks a reversal of the trial court's ruling as to all the Gardena defendants, he presents no argument to challenge the determination of immunity as to the individual officers.

Section 17004, upon which the trial court relied, states: "A public *employee* is not liable for civil damages on account of personal injury to or death of any person or damage to property resulting from the operation, in the line of duty, of an authorized emergency vehicle while responding to an emergency call or when in the immediate pursuit of an actual or suspected violator of the law, . . ." (Italics added.)

Based thereon, we perceive no error in the trial court's determination that officers Swain, Schmidt and Batungbacal are immune from liability herein.

3. *Statutory scheme pertaining to public entity immunity for vehicle pursuits.*

Government Code section 815.2, subdivision (b), states: "*Except as otherwise provided by statute*, a public entity is *not* liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (Italics added.)

As indicated, section 17004 confers immunity upon public employees responding to emergency calls or in the pursuit of an actual or suspected violator of the law.

■ However, a public entity has liability for vehicle pursuits even though the public employee is immune. Section 17001 states: "A public entity *is liable* for death or injury to person or property proximately caused

by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment." (Italics added.)

Thus, section 17001 " 'otherwise provides' " for public entity liability and comes within the exception of Government Code section 815.2, subdivision (b). (*Brummett* v. *County of Sacramento* (1978) 21 Cal.3d 880, 885 [148 Cal.Rptr. 361, 582 P.2d 952, 4 A.L.R.4th 858].)

A public entity may obtain immunity from the liability imposed by section 17001 if it adopts a vehicle pursuit policy which complies with section 17004.7.[7]

Section 17004.7 was enacted in 1987 to provide immunity to governmental entities which previously had enjoyed only limited immunity while their police officer employees were entirely immune under section 17004. (*Kishida* v. *State of California* (1991) 229 Cal.App.3d 329, 336 [280 Cal.Rptr. 62].)

Section 17004.7 states: "[¶] (a) The immunity provided by this section is in addition to any other immunity provided by law. The adoption of a policy by a public agency pursuant to this section is discretionary. [¶] (b) A public agency employing peace officers which adopts a written policy on vehicular pursuits complying with subdivision (c) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued by a peace officer employed by the public entity in a motor vehicle. [¶] (c) If the public entity has adopted a policy for the safe conduct of vehicular pursuits by peace officers, it shall meet all of the following *minimum standards*: [¶] (1) It provides that, if available, there be supervisory control of the pursuit. [¶] (2) It provides procedures for designating the primary pursuit vehicle and for determining the total number of vehicles to be permitted to participate at one time in the pursuit. [¶] (3) It provides procedures for coordinating operations with other jurisdictions. [¶]

[7]While Government Code section 845.8, subdivision (b), immunizes a public entity from liability for injuries caused by persons resisting or escaping arrest (*Kisbey* v. *State of California* (1984) 36 Cal.3d 415, 419 [204 Cal.Rptr. 428, 682 P.2d 1093]), section 17001 carves out an exception to the general rule of immunity for injuries caused by fleeing suspects, when the police vehicular pursuit is conducted negligently. (*Hooper* v. *City of Chula Vista* (1989) 212 Cal.App.3d 442, 450 [260 Cal.Rptr. 495], review den.; see Cal. Gov. Tort Liability Practice (Cont.Ed.Bar 1992) § 4.44, pp. 509-510.) If the immunity provision of Government Code section 845.8, subdivision (b), were controlling, the adoption of a vehicular pursuit policy pursuant to section 17004.7 would be largely an idle act.

(4) It provides *guidelines* for determining when the interests of public safety and effective law enforcement justify a vehicular pursuit and when a vehicular pursuit should not be initiated or should be terminated. [¶] (d) A determination of whether a policy adopted pursuant to subdivision (c) complies with that subdivision is a *question of law* for the court." (Italics added.)

Section 17004.7 was passed as "part of a package popularly characterized as government tort reform legislation. According to the League of California Cities, one of the sponsors of the package, this provision 'is intended to encourage agencies to adopt *express guidelines* which should reduce the frequency of accidents, while leaving to these agencies the fundamental law enforcement decisions about when to undertake a pursuit, free from threats of liability.' [Citation.]" (*Kishida* v. *State of California, supra,* 229 Cal.App.3d at p. 335, italics added.)

*Weiner* v. *City of San Diego* (1991) 229 Cal.App.3d 1203, 1210 [280 Cal.Rptr. 818], observed section 17004.7 "implicitly acknowledges public agencies [which] choose to adopt a written policy for vehicular suspect pursuits should not have their coffers emptied as a result of the actions of a third party fleeing suspect. [The Legislature] *narrowly* worded the statute to only grant immunity where the suspect's vehicle is involved in the accident with an innocent third party and where the public agency has satisfied the requirement of *a written policy which complies with certain specific points to encourage safe police pursuits.*" (Italics added.)

4. *No merit to Colvin's contention the police chief's issuance of the directive does not amount to adoption of a pursuit policy by a public entity for purposes of immunity.*

█ Colvin contends a police chief lacks authority to promulgate the policy contemplated by section 17004.7 as the Department merely is a subsidiary agency of the City, and the instant directive issued by Gardena's chief of police, in the absence of city council adoption or ratification, does not amount to the adoption of a policy by a public agency or public entity within the meaning of the statute.[8]

*Peterson* v. *City of Long Beach* (1979) 24 Cal.3d 238 presented an analogous situation. That case involved a wrongful death action against a

---

[8]Colvin did not argue before the trial court the City had failed to "adopt" the subject policy. However, the issue has been fully briefed on appeal and presents only a question of law based on the facts appearing in the record. Therefore, the issue will be given due consideration. (See *State of California* ex. rel. *Public Works Bd.* v. *Bragg* (1986) 183 Cal.App.3d 1018, 1023-1024 [228 Cal.Rptr. 576].)

city and a police officer arising out of a shooting incident. (*Id.*, at p. 241.) The issue was whether the Long Beach Police Department Manual contained regulations of a public entity. (*Ibid.*) The question was pertinent because Evidence Code section 669, subdivision (a)(1), provides the failure of a person to exercise due care is presumed if he or she has violated a regulation of a public entity. (24 Cal.3d at pp. 241-242.)

To resolve the issue, the Supreme Court looked to Evidence Code section 200, which broadly defines public entity to include " 'a nation, state, county, city and county, city, district, *public authority*, *public agency*, or any other political subdivision or public corporation, whether foreign or domestic'; . . ." (*Peterson, supra*, 24 Cal.3d at pp. 243-244, first italics added.) *Peterson* also relied on the Law Revision Commission Comment to Evidence Code section 200 which states " '[t]he broad definition of "public entity" includes *every form of public authority* . . . .' " (24 Cal.3d at p. 244.)

Peterson reasoned: "A city is a public entity. But so are the office of its city manager and the department that its police chief directs. Each traditionally has been regarded as an 'agency' of the city, obviously 'public.' We find it hard to believe that the Legislature would not regard city managers and police chiefs (whose power to promulgate rules is conceded) as heads of a 'form of public authority.' Since, therefore, when they promulgated the manual the city manager and the police chief were acting as heads of a public entity, as defined by the Legislature, and since [the manual provision] clearly is a 'regulation,' " the Long Beach Police Department Manual contained regulations of a public entity, within the meaning of Evidence Code section 669. (*Peterson, supra*, 24 Cal.3d at p. 244.)

*Peterson* disapproved *Vallas* v. *City of Chula Vista* (1976) 56 Cal.App.3d 382, 387-388 [128 Cal.Rptr. 469], which had reached a contrary conclusion. (*Peterson, supra*, 24 Cal.3d at p. 245, fn. 3.) *Vallas* found the Chula Vista Police Manual was not a regulation of a public entity within the meaning of Evidence Code section 669. (*Vallas, supra*, 56 Cal.App.3d at pp. 386-388.) *Vallas* held "the police department is merely an integral part of a public entity and not an entity itself." (*Id.*, at p. 388.)

We observe Government Code section 811.2, within the California Tort Claims Act, and section 17000, also define public entity as including "*public authority, public agency*, and any other political subdivision or public corporation" in the State.

Thus, Government Code section 811.2, Evidence Code section 200, and section 17000, all define public entity as including public authority and

public agency. Given the broad meaning ascribed to these terms by statute, and in view of *Peterson*, we conclude the police chief's issuance of a directive in the instant case was appropriate in light of the police chief's role as head of a form of public authority and the directive amounts to the adoption of a pursuit policy by a public agency or public entity within the meaning of section 17004.7.

> a. *No merit to Colvin's argument that Evidence Code section 669.1 precluded the police chief or the department from promulgating pursuit policy.*

█ Colvin contends *Peterson*'s broad interpretation of a police department as a public entity empowered to adopt policies or guidelines was superseded by the enactment of Evidence Code section 669.1 in 1983. That section provided "[a] local rule, regulation, or guideline setting standards of conduct for peace officers in the use of deadly force shall not be considered a statute, ordinance, or regulation of a public entity" for purposes of the presumptive negligence rule of Evidence Code section 669. (Evid. Code, former § 669.1; added by Stats. 1983, ch. 168, § 1, p. 586; *Lehto* v. *City of Oxnard* (1985) 171 Cal.App.3d 285, 294 [217 Cal.Rptr. 450].)[9]

However, Evidence Code section 669.1 did not divest local police departments of their power to promulgate rules, regulations or guidelines. It merely limits the evidentiary uses of such regulations, by providing "[t]his section affects *only* the presumption set forth in Section 669, . . ." (Evid. Code, § 669.1, italics added.) The Legislature's intent in adopting section 669.1 was " 'to permit localities to adopt rules of peace officer conduct without fear of presumptive civil liability.' " (*Lehto, supra*, 171 Cal.App.3d at p. 294, fn. 5.)

Consequently, Evidence Code section 669.1 did not preclude the City from adopting a vehicular pursuit policy by way of a directive issued by its chief of police.

---

[9]The Legislature amended Evidence Code section 669.1 in 1987 to its present version, which provides: "A . . . policy . . . of . . . local government setting forth standards of conduct or guidelines for its employees in the conduct of their public employment shall not be considered a statute, ordinance, or regulation of that public entity within the meaning of Section 669, unless the . . . policy . . . has been formally adopted . . . , as an ordinance of a local governmental entity in this state empowered to adopt ordinances, . . . This section affects only the presumption set forth in Section 669, and is not otherwise intended to affect the admissibility or inadmissibility of the . . . policy . . . under other provisions of law."

5.  *City lacks immunity under section 17004.7 due to inadequacy of its policy.*

a.  *Standard for reviewing sufficiency of vehicular pursuit policy.*

■  Section 17004.7, subdivision (d), mandates that the determination as to whether a policy adopted by a public agency pursuant to subdivision (c) is adequate to confer immunity is a *question of law* for the court. Therefore, we conduct an *independent review* of the City's efforts at compliance. (*Weiner* v. *City of San Diego, supra,* 229 Cal.App.3d at p. 1211.)

As indicated, for immunity to attach under section 17004.7, a pursuit policy must meet "all of the . . . minimum standards" set forth in subdivision (c). Further, *Weiner, supra,* 229 Cal.App.3d at page 1210, directs that the Legislature *narrowly* worded the section to grant immunity only where a written policy "complies with certain specific points to encourage safe police pursuits."

■  Therefore, to receive the benefit of immunity under section 17004.7, a public entity must comply fully with the requirements of the statute.[10]

b.  *Adoption of minimum standards or guidelines contemplates selection of specific factors to guide police officers' exercise of their discretion.*

Our decision on independent review rests on an analysis of the adequacy of the minimum standards or guidelines in the pursuit policy adopted by the City in its quest for immunity under section 17004.7.

A guideline is "an indication or outline of future policy or conduct." (Webster's Third New Internat. Dict. Unabridged (1986) p. 1009.) Thus, guidelines are *specific* in nature and set forth criteria or factors which serve to constrain the discretion of a decision maker.

By way of examples already in the law, Public Resources Code, section 21083, found within the California Environmental Quality Act or CEQA (Pub. Resources Code, § 21000 et seq.), requires the adoption of guidelines which specifically include *criteria* for determining whether a proposed project may have a significant environmental impact.

---

[10]There is no merit to the City's argument that *Weiner* adopted a substantial compliance standard for testing compliance with section 17004.7. Rather, *Weiner* disregarded the trial court's finding the policy " 'substantially complied' " with the statute, holding the trial court's decision was correct in result. (*Weiner, supra,* 229 Cal.App.3d at p. 1211.)

However, even assuming substantial compliance were the standard, Gardena's pursuit policy would not pass muster.

Further, California Code of Regulations, title 10, chapter 5, subchapter 4.7, section 2632.13.1, sets forth *specific* guidelines for determining whether a driver was principally at fault for an accident for determining qualification to purchase a good driver discount policy.

Also, rule 1274 of the California Rules of Court sets forth highly *specific* guidelines for calculating child support awards. The amount is to be based, inter alia, on the net monthly disposable income of each parent and the percentage of time each parent has primary responsibility for the children. (Cal. Rules of Court, rule 1274 (c)(1), (c)(2).)

Likewise, the State Bar Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V), which have been referred to as guidelines (see *In re Leardo* (1991) 53 Cal.3d 1, 18, fn. 8) [278 Cal.Rptr. 689, 805 P.2d 948], specify standards for selecting a sanction in a particular case. Those detailed guidelines set forth the standard sanctions for various acts of misconduct, as well as aggravating and mitigating circumstances.

All the guidelines contemplated above call for the implementation of specific standards.

Applying the ordinary meaning of guidelines to section 17004.7, subdivision (c)(4), it is clear the Legislature contemplated public entities seeking immunity must adopt reasonably specific criteria to give direction to officers in the field.

To assist our determination of the sufficiency of Gardena's minimum standards, particularly its guidelines in the sensitive area of initiating and terminating vehicular pursuits, we have examined the pursuit policy adopted by the City of San Diego, a copy of which was before the trial court on the motion for summary judgment. *Weiner* found San Diego's policy to be adequate, albeit without substantial analysis. (See *Weiner, supra,* 229 Cal.App.3d at p. 1211.)

In addition, for comparison's sake, we have taken judicial notice of the pursuit policies of the City of Los Angeles, the County of Los Angeles and the City and County of San Francisco. Also, we have scrutinized the pursuit policies of three smaller cities in Los Angeles County, namely, Manhattan Beach, Redondo Beach and Arcadia, which are comparable in size to the City of Gardena. (Evid. Code, §§ 452, subd. (b), 459.)[11]

We need not and do not decide whether and to what extent these other policies comply with the minimum standards of section 17004.7. We examine these policies simply to ascertain some of the factors which have been

---

[11]Proper notice was provided to the parties of our intent to take judicial notice. Each of these policies then was made part of the record on appeal.

considered relevant by public entities in drafting a police pursuit policy in compliance with the statute.

As indicated, because the Legislature *narrowly* worded the statute only to grant immunity where written policies comply with "specific points to encourage safe police pursuits" (*Weiner, supra,* 229 Cal.App.3d at p. 1210), we are convinced policies must clearly and with specificity set forth standards to guide officers in the field. If such factors are not detailed, there has not been compliance with section 17004.7, subdivision (c), and immunity does not attach.

We further believe the Legislature was aware in 1987 when section 17004.7 was adopted of the tragic consequences to innocent third parties which have resulted from the failure of public entities to provide adequate guidelines to officers "[to] justify a vehicular pursuit and when a vehicular pursuit should not be initiated or should be terminated." (§ 17004.7, subd. (c)(4).) This court also can take judicial notice of prominent and pervasive news coverage of at least 10 pursuit-related deaths in Southern California in recent weeks alone, as well as personal injuries and property damage to noninvolved parties (Evid. Code § 452, subds. (g), (h); *Powell* v. *Superior Court* (1991) 232 Cal.App.3d 785, 790, fn. 2 [283 Cal.Rptr. 777]), and the inescapable conclusion that high-speed chases are dangerous even under the best of circumstances.

    c.   *Gardena's policy lacks guidelines for initiating and discontinuing vehicular pursuits.*

With the standard enunciated above in mind, we review Gardena's guidelines for initiating and terminating a vehicular pursuit. The City's policy states: "V. *Procedure* [¶] A. Initiation of pursuits: Pursuits may be initiated when an officer has reasonable cause to stop a vehicle and the driver fails to stop as required by law. [¶] B. Discontinuance of pursuits: Justification to continue a pursuit will be based on what reasonably appears to be the facts known or perceived by the officer. Officers should consider discontinuing a pursuit when it poses a serious and unreasonable risk of harm to the pursuing officer or to the public balanced against the seriousness of the violations, or when directed to do so by a supervisor."

The policy's general provision that pursuits may be initiated whenever an officer has reasonable cause to stop a vehicle and the driver fails to stop does not provide any "guidelines for determining when the interests of public safety and effective law enforcement justify a vehicular pursuit and when a vehicular pursuit should not be initiated." (§ 17004.7, subd. (c)(4).) The

policy simply authorizes pursuits in *all* instances when reasonable cause exists to stop a vehicle and the driver fails to stop. The policy fails to articulate *any* guidelines for determining when the gravity of a particular situation justifies the initiation of a pursuit.

Under this lax standard, the "reasonable cause to stop a vehicle" as justification for the *initiation* of a pursuit could apply to a mere Vehicle Code violation for a nonfunctioning tail lamp (§ 24600), or other minor violation.

In contrast, the San Diego policy at least provides an officer may *initiate* a pursuit when, inter alia, a known wanted felon is in the vehicle or the occupants of the vehicle have committed a crime in the officer's presence.

In addition to failing to set forth guidelines for initiating a pursuit, the City's policy lacks any guidelines for *discontinuing* a pursuit. The City's policy merely directs officers to engage in a cost/benefit analysis and to discontinue a pursuit whenever the risk of harm to the officer or to the public outweighs the seriousness of the violations. However, there are no guidelines to assist the officer in balancing risks and benefits. Consequently, this element of the City's policy is purely conclusionary.

In contrast, the San Diego policy sets forth the following *factors* an officer should consider in determining whether a pursuit should be *terminated*: vehicular traffic, pedestrian, roadway and environmental conditions; the violation for which the suspect is wanted; whether the suspect is known to be a juvenile; and, whether the suspect has been identified to the point that later apprehension can be accomplished.

Also, in this regard, San Francisco's policy states a pursuit should be discontinued when an unreasonable danger exists to the officers or others. Its guidelines go on to state: "An unreasonable danger exists when speeds dangerously exceed the normal flow of traffic or when vehicular or pedestrian traffic necessitates dangerous maneuvering exceeding the performance capabilities of the vehicle or driver, or when the reason for apprehending the pursued vehicle clearly is outweighed by the risk of harm imposed on the person or property of the officers or others if the pursuit is continued."

Also by comparison, the policy of the County of Los Angeles directs a pursuit to be discontinued, inter alia, "[a]fter a reasonably short distance when the only known reason for the pursuit is traffic violations or other misdemeanors, or known or suspected G.T.A. [grand theft auto] suspects" or when the pursuit is as a result of action by another police department

traversing the County's jurisdiction and the County's assistance is no longer needed.

Further, the policies of the City of San Francisco and the County of Los Angeles both emphasize the immediate apprehension of the violator is "never more important than the safety" of innocent persons or the officers themselves. Similarly, the San Diego policy directs the officers to "continually question whether the seriousness of the offense justifies continuing the pursuit" and cautions that a pursuit should be continued only "as long as it is safe to do so."

Gardena's policy merely directs officers to discontinue a pursuit whenever the risk of harm to the officer or to the public outweighs the seriousness of the violations.

It would seem the City displayed a calculated disinclination to set forth any "minimum standards," and instead sought to clothe its officers with maximum discretion and flexibility. Its policy blatantly eschews setting forth such obvious factors, inter alia, as weather, visibility, vehicular and pedestrian traffic, surface and other roadway conditions, speed, experience of the officers, nature of the offense, capacity of police vehicle, and distance travelled.

We therefore conclude Gardena's pursuit policy fails to advance the Legislature's purpose of promoting public safety through the adoption of specific pursuit guidelines. The policy is bereft of any guidelines to equip officers in the field in determining when the interests of public safety and effective law enforcement justify *initiation* of a vehicular pursuit or require *termination* of a pursuit. (§ 17004.7, subd. (c)(4).) The policy " 'impermissibly delegates basic policy matters to police[ officers], . . . for resolution on an *ad hoc* and subjective basis' " (*People* v. *Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 390 [250 Cal.Rptr. 515, 758 P.2d 1046]), thereby defeating the Legislature's intent that vehicle pursuits be conducted pursuant to rational guidelines.

In sum, because the policy lacks as minimum standards the guidelines required by subdivision (c)(4) of section 17004.7, immunity does not attach.

d. *Gardena's policy also fails to provide procedures for designating primary pursuit vehicle and for determining total number of participating vehicles.*

Section 17004.7, subdivision (c)(2), requires a pursuit policy to provide "procedures for designating the primary pursuit vehicle and for determining

the total number of vehicles to be permitted to participate at one time in the pursuit." In this regard, Gardena's policy states an officer may initiate a pursuit upon reasonable cause and a pursuit initiated by a motorcycle or unmarked police unit should be abandoned when a marked four-wheeled unit is available to assume the pursuit.

In addition, the policy provides the number of police units involved in a pursuit may vary with the circumstances and should be kept to a minimum. It directs the second and subsequent units to communicate with the dispatch center and requires supervisors to assure no more than the required number of police units are involved in the pursuit.

These loose and conclusionary provisions do not amount to procedures for designating the primary pursuit vehicle and for determining the total number of vehicles permitted to participate at one time in the pursuit. The policy just reflects the obvious fact that some vehicle initiates the pursuit and states if the initiating vehicle is an unmarked police car or motorcycle, such vehicle should abandon the pursuit in favor of a marked four-wheeled unit. The policy also contemplates the participation of second and subsequent units. It then states in a conclusionary manner that the number of participating vehicles should be kept to a minimum.

In contrast, the policy of the City of Los Angeles states the initial pursuing unit shall be designated the primary pursuit vehicle, and that in the event the primary unit cannot continue as the primary unit, the secondary unit shall become the primary unit.

Similarly, San Diego's policy provides, in relevant part, that in the event another unit becomes better positioned to provide cover for the chase unit, then that unit shall become the primary *assisting* unit and the former assisting unit shall cease any violation of traffic laws.

The policy of the City of Los Angeles further states, inter alia: "*Number of Police Units Participating. The initial pursuing police unit (primary unit) and the back-up police unit (secondary unit) shall be the only units to pursue the suspect vehicle*" unless the primary unit requests additional units to join the pursuit if it appears necessary to safely effect the arrest of the suspects. (Italics added.)

Likewise, the policy of the County of Los Angeles provides "[t]he active pursuit shall normally consist of no more than three units: the primary unit; and two back-up units," unless more assistance is specifically requested.

Similarly, the Manhattan Beach policy provides, with respect to the number of participating police units, that only the initial pursuing unit and a secondary unit shall pursue a suspect fleeing in a vehicle.

San Francisco's policy also limits pursuits to two units, unless otherwise directed by a supervisory or command officer. It also requires pursuing units to monitor radio communications to ascertain that no more than two units are involved.

It is obvious the more vehicles involved in high-speed pursuits, the greater the probability for accidents. Gardena's policy sets forth no limit and merely leaves the number of chase cars to the exercise of discretion.

Based on the foregoing, we conclude Gardena's policy lacks adequate procedures for designating the primary pursuit vehicle and, while the policy requires the total number of participating vehicles to be "kept to a minimum," it fails to provide adequate procedures for determining the total number of vehicles to be permitted to participate at one time in the pursuit. (§ 17004.7, subd. (c)(2).)

    e.   *Conclusion on analysis of Gardena's policy.*

Based on our analysis of the City's attempts to comply with the minimum standards prescribed by section 17004.7, just in subdivisions (c)(2) and (c)(4), we conclude the City has no immunity under the statute.[12]

Our holding is narrow. We express no opinion as to the merits of Colvin's action. We reverse solely as to the City on the ground it lacks immunity under section 17004.7.

*6.  No merit to Colvin's argument the City failed to disseminate its policy, but immaterial since immunity fails for lack of minimum standards and guidelines.*

In opposing summary judgment, Colvin called into question whether the City actually had disseminated the directive to its officers.

In this regard, Colvin cited the deposition testimony of Batungbacal who was asked what factors he had been taught as a Gardena police officer to use as circumstances for terminating a pursuit. He responded: "Well, I don't think there's anything that's been put down in writing. It's all a—*it's as the policy says*, it's just discretion. You look at the circumstances you have." (Italics added.)

Contrary to Colvin's argument, this statement by Batungbacal tends to show the City's policy actually had been disseminated and that Batungbacal

---

[12]Because Gardena's policy is infirm due to noncompliance with subdivisions (c)(2) and (c)(4) of section 17004.7, it is unnecessary to scrutinize the policy pursuant to subdivisions (c)(1) and (c)(3) of the statute.

was aware of its vague contents. However, Batungbacal's statement also confirms our conclusion the City's policy lacked adequate guidelines and gave too much discretion to the officers in the field.[13]

## CONCLUSION

Recent news coverage in Southern California has shown that vehicle pursuits by police agencies can result in tragic consequences to innocent third parties. (Evid. Code § 452, subd. (h).) Section 17004.7, if properly implemented, can help reduce the frequency of such accidents. This statute therefore represents another balancing between the interests of public entities and the general population. To gain the benefit of immunity from liability for vehicle pursuits, public entities are required to adopt pursuit policies enunciating minimum standards, with specific guidelines which give due consideration to safety concerns. Vague or conclusionary language in a pursuit policy allowing unfettered discretion to the officers in the field is not a substitute for the reasoned standards and guidelines contemplated by section 17004.7.

## DISPOSITION

The judgment is reversed as to the City and is affirmed as to the officer defendants. Colvin to recover costs on appeal.

Croskey, J., and Hinz, J., concurred.

---

[13]In view of our conclusion immunity does not attach due to deficiencies in the City's policy, it is unnecessary in this case to address whether, in addition to adopting a pursuit policy, a public entity must take reasonable steps to *disseminate* its policy to its officers. For the same reason, it is unnecessary to address whether immunity attaches even in the absence of a good faith effort to comply with the policy. (See *Kishida* v. *State of California, supra*, 229 Cal.App.3d at p. 335 and *Weiner* v. *City of San Diego, supra*, 229 Cal.App.3d at p. 1210, which do not require any proof the policy actually was practiced during a particular chase.)

# EXHIBIT "A"

## DECLARATION OF RICHARD K. PROPSTER
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1. I am the Chief of Police of the Gardena Police Department.

2. Effective April 2nd 1987, I issued General Order No. GO-0029 to all personnel pertaining to Pursuit Driving by Gardena police officers.

3. A true copy of that General Order is attached hereto and was in force at the date and time of the incident in question on 1-13-88.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 30ᵗʰ of January 91 at City of Gardena, California.

_____
RICHARD K. PROPSTER

OFFICE OF THE POLICE DEPARTMENT

GITY of GARDENA

| TYPE OF DIRECTIVE | | Effective Date | NUMBER |
|---|---|---|---|
| GENERAL ORDER | | 02 April 87 | GO-0029 |
| SUBJECT OF DIRECTIVE | | Duration | Distribution |
| PURSUIT DRIVING | | UNTIL RESCINDED | ALL PERSONNEL |
| Amends | Rescinds | Supplements | Cross-Reference |
| NONE | GO74- COPY | NONE | NONE |

**I. PURPOSE**

   A. To establish guidelines regarding police vehicular pursuits in order to assign responsibilities and to assist officers in the exercise of discretion in an attempt to reduce foreseeable hazards to the public and police officers.

**II. DEFINITIONS**

   A. Vehicular Pursuit: To follow in order to overtake, capture, etc.; chase, by means of a motor vehicle.

**III. SCOPE**

   A. This order shall affect all personnel.

**IV. POLICY**

   A. It shall be the policy of this Department to develop procedures which enhance our ability to achieve our stated objective of apprehending and prosecuting offenders.

**V. PROCEDURE**

   A. Initiation of pursuits: Pursuits may be initiated when an officer has reasonable cause to stop a vehicle and the driver fails to stop as required by law.

B.  Discontinuance of pursuits:  Justification to continue a
    pursuit will be based on what reasonably appears to be
    the facts known or perceived by the officer.  Officers
    should consider discontinuing a pursuit when it poses a
    serious and unreasonable risk of harm to the pursuing
    officer or to the public balanced against the
    seriousness of the violations, or when directed to do so
    by a supervisor.

C.  Pursuit considerations

    1.  The first responsibility of the officer(s)
        initiating a pursuit is the exercise of discretion
        in an attempt to reduce foreseeable hazards to the
        public and pursuing officers.

    2.  To discourage violators, or suspects, from
        attempting to avoid arrest by fleeing, officers
        shall be in close proximity to the violator's
        vehicle, whenever possible, before activating red
        lights and attempting to stop the suspect vehicle.

    3.  The initiating and assisting police units shall
        activate the red light and siren continuously when
        involved in a pursuit.  Police units not equipped
        with red light and siren, shall not become involved
        in a pursuit.

    4.  The number of police units involved in a pursuit may
        vary with the circumstance and should be kept to a
        minimum.

    5.  A pursuit initiated by motorcycle or unmarked police
        unit should be abandoned when a marked four wheeled
        unit is available to assume the pursuit.

        If necessary, the initiating motorcycle or unmarked
        unit that discontinued the pursuit should proceed to
        the termination point, obeying applicable traffic
        laws.

    6.  Use of any type of force to terminate a pursuit must
        comply with the existing use of force policy.

    7.  The initiating and/or lead unit of the pursuit has a
        responsibility to protect and control the
        termination point crime scene.

D. Radio Procedures

1. The unit initiating a pursuit, or joining an outside agency pursuit, should immediately broadcast the following:

   Location and direction of travel

   Reason for the pursuit

   Speed

   Description of Vehicle

   Number and description of occupants

   Identity of occupants if known

2. During the pursuit the above information should be updated.

3. Officers in the second and subsequent units joining or paralleling the pursuit shall notify the dispatch center as soon as possible.

4. If practical, the second unit should assume responsibility for radio procedures in calling the pursuit.

5. If an air unit enters the pursuit, it may assume responsibility for broadcasting the pursuit route.

E. Supervisors Responsibility

1. Upon becoming aware of a pursuit, the supervisor should assure himself of the following:

   a. No more than the required police units are involved in the pursuit.

   b. Proper radio frequencies and procedures are being used.

   c. Affected allied agencies are being notified.

   d. Police air units have been requested as appropriate.

2. The supervisor shall order the discontinuance of the pursuit when it appears to him that the pursuit poses an unreasonable risk of harm to the pursuing officers or the public, when balanced against the seriousness of the causative factor(s).

3. The supervisor should proceed to the termination point of the pursuit.

**F.** Pursuit by Other Agencies Entering the City

  1. In the event of a pursuit entering into this department's jurisdiction, the initiating agency shall be responsible for the progress of their pursuit and conduct. We do not accept responsibility for other agencies pursuits that enter our jurisdiction.

  2. Units from the Department shall not attempt to assist or enter into the pursuit unless specifically requested to do so by the initiating agency, or they are justified by what appears to be the facts known or perceived by the officer.

**VI.** <u>RESPONSIBILITY OF DEPARTMENT MEMBERS</u>

  **A.** All personnel are required to follow this General Order until rescinded or superseded.

  **B.** Violation of this General Order is a violation of rules and regulations published by this Department and is a disciplinary offense.

  **C.** All personnel shall become familiar with the contents of this General Order and are responsible for the understanding of its terms and conditions.

  **D.** Suggestions for improving this procedure shall be forwarded in writing to the Originator through the chain of command. The contents of this order have been recommended for inclusion as a section of the Manual of Policy and Procedure.

**VII.** <u>ORIGINATOR'S SIGNATURE AND RANK</u>

Richard K. Propster
CHIEF OF POLICE

EXHIBIT "B"

| SAN DIEGO POLICE DEPARTMENT PROCEDURE<br>Origin: CHIEF OF POLICE | DATE:<br>04/04/88 | PAGE:<br>1 OF 6 | NO. 1.3<br>ADMINISTRATION |
|---|---|---|---|
| DISSEMINATION:<br>ALL PERSONNEL | SUBJECT:<br>PURSUIT PROCEDURES | | |
| ORIGINATING DIVISION:<br>FIELD OPERATIONS | NEW PROCEDURE ☐ PROCEDURAL CHANGE ☐<br>SUPERCEDES: 1.3, 12/20/87 | | RELATED POLICY:<br>1.3 |

I. BACKGROUND:

   A. A vehicle pursuit exposes the officer, the fleeing violator, pedestrians, drivers and passengers of other motor vehicles to the possibility of death or serious injury. Pursuits may also result in damage to personal property.

   B. When engaged in a pursuit, and when deciding whether the pursuit should be continued, officers should weigh the seriousness of the violator's suspected crime against the potential of death or injury if the chase is continued.

   C. Officers should not assume that all persons who flee from the police and refuse to yield are felons. Experience has shown that many pursuits involve misdemeanor violations only.

   D. In the heat of a chase, the violator frequently refuses to give up and the officer likewise feels an obligation to succeed in the pursuit. This psychological phenomenon can cloud an officer's judgment and may cause the officer to continue a chase beyond the point where common sense and good judgment would require the pursuit to be terminated.

II. DEFINITION:

A vehicle pursuit is defined as an active attempt to stop a moving motor vehicle when the driver of such vehicle is aware of the attempt and is resisting apprehension by maintaining or increasing speed or by ignoring the officer's attempt to stop the vehicle.

III. PROCEDURES:

   A. Initiating the Pursuit

      1. An officer may initiate a pursuit under the following conditions:

         a. When a known wanted felon is in the vehicle.

         b. When the occupant(s) of the vehicle have committed a crime in the officer's presence.

         c. When the officer has an articulable reason for wanting to stop the vehicle.

*R*-271895

1294

2. When an officer becomes involved in the pursuit of a vehicle that fails to stop for the officer's emergency lights and siren, the officer shall immediately notify radio of the:

   a. License number, if possible.

   b. Color and type of vehicle.

   c. Number of occupants, including description, if possible.

   d. Any known information about weapons carried by occupants.

   e. Reason for the pursuit, including the crime involved.

      (Example:  high speed failure to yield, misdemeanor/felony suspect, etc.)

   f. Direction of travel and route during the pursuit.

B. Communications Division

   1. When a pursuit begins, Communications Division will;

      a. Alert the nearest supervisor in the field so that supervisor can monitor and order termination of the pursuit if it becomes unreasonable under the existing circumstances.

NEW ---   b. Notify the Duty Lieutenant who in the absence of a field supervisor will monitor the pursuit and order termination if it becomes unreasonable under the existing circumstances.

NEW ---   c. Notify and inquire into the availability of air support from ASTREA and/or PAC-1 (SDPD Air Support) and notify field units.

C. Assisting Units

   1. Assisting units are required to:

      a. Provide adequate cover for a pursuing unit for purposes of officer safety.

      b. Attempt to station themselves at strategic points in anticipation of assisting when the suspect is stopped or;

      c. become the chase unit if the original pursuing unit loses the suspect vehicle or becomes disabled.

NEW ---   d. Advise communications that they are the primary pursuit unit.

R-271895

2. There will be only one primary assisting unit following the pursuing unit.

   a. The primary assisting unit is to violate traffic laws only when it is necessary in order to provide cover for the chase unit.

   b. The primary assisting unit will use emergency lights and siren during such traffic violations.

   c. It may also be necessary for the primary assisting unit to use red lights and siren during slow speed failures-to-yield to block-off traffic and prevent it from overtaking the pursuit from behind. This would be important on freeways and multi-laned streets.

3. In the event that another unit becomes better positioned to provide cover for the chase unit, then that unit shall become the primary assisting unit and the former primary assisting unit shall cease any violation of traffic laws and use of emergency lights and siren. That unit may, as practical, continue to assist as a secondary assisting unit within the parameters of the traffic laws.

D. Terminating the Pursuit

1. The Primary Unit may continue a pursuit as long as it is safe to do so or until directed to terminate the pursuit by a supervisor.

2. Officers must continually question whether the seriousness of the offense justifies continuing the pursuit.

NEW

3. Factors pursuing officers should consider in determining whether a pursuit should continue or be terminated:

   a. Vehicular traffic, pedestrian, roadway and environmental conditions

   b. Violation for which suspect is wanted

   c. Suspect is known to be a juvenile

   d. Suspect has been identified to the point that later apprehension can be accomplished

E. Motorcycle Units

In the event a pursuit is initiated by a motorcycle unit, that motorcycle unit should abandon the pursuit when a four-wheel, marked unit is in a position to assume the pursuit.

R-271895

F.  Unmarked Units

Unmarked units shall not get involved in pursuits unless there is a life/death situation, such as kidnapping/hostage type incident.  In such cases, the unmarked units should only be utilized for surveillance purposes.  Unmarked units are to obey all traffic laws.

G.  Joint Agency Pursuits

1.  The initiating agency will generally retain jurisdiction and remain responsible for a pursuit in progress even though it enters another agency's boundaries.

2.  San Diego Police Department units shall not join in an active pursuit by another agency unless they are specifically requested to do so and then only with the approval of a field supervisor or as authorized by Communications.

3.  Although every agency's communications center is to notify any affected allied agency as quickly as possible of the pursuit, SUCH NOTIFICATION IS NOT TO BE CONSIDERED A REQUEST FOR ASSISTANCE.

4.  The initiating officer or the field supervisor will be solely responsible for determining if any allied agency assistance is needed and will specify to what extent, if any.

5.  Chase units should keep in mind that there may be times when it will be practical to relinquish the chase to another agency, especially when entering areas off the freeway where another local officer is more familiar with the streets, or when equipment failure requires it.

    a.  If the primary pursuit unit chooses to or is forced to give up the chase to another agency, that agency must be willing to accept it.

    b.  If the pursuit is actually turned over to another agency, the initiating officer shall abandon the chase totally but must remain available to cooperate with the arresting units if the suspect is apprehended.

6.  On joint agency pursuits, THERE MUST NEVER BE ANY MORE THAN TWO PRIMARY UNITS DIRECTLY INVOLVED.

    a.  A field supervisor shall become proactively involved in every chase incident to ensure that every officer involved abides by the Code Three policy and the two-car chase unit limit.

R· 271995

b.  The field supervisor for the primary pursuit unit will direct operations for all officers involved.

c.  Whenever possible, communications between the different agencies should be established car to car on CLEMARS.

7.  Although the initiating agency has a legal right, by virtue of hot pursuit, to continue a chase in another jurisdiction, Department Procedure requires that any request by another agency to abandon the pursuit within their boundaries will be complied with immediately when good cause is given (i.e., advising that the pursuit is about to enter a school area where children are present, etc.).

H.  Aircraft Assistance

1.  Units may have access to aircraft assistance from our own aircraft or the San Diego County Sheriff's Department.

2.  Aircraft can provide information to ground units concerning upcoming traffic congestion, hazards or other factors which might endanger the safety of the officer or the public.

3.  Once the aircraft is in position to take over a pursuit, it will become the primary pursuit unit for as long as it is able to do so.

I.  Shooting at Vehicles

Shooting at or from moving vehicles is prohibited except when immediately necessary to protect persons from death or serious bodily injury.  (Firearms Procedures 1.5)

J.  Barricading Roadways

1.  Barricading a roadway must be considered as a force likely to result in death or serious bodily injury.  Therefore, this method is not to be used in misdemeanor pursuits and only as a last resort in suspected felony cases where the violator constitutes an immediate and continuing major threat to the safety of the public and all other efforts have failed.

2.  Under no circumstances will a roadway be barricaded by occupied vehicles or vehicles belonging to private citizens.  If barricading is deemed necessary to apprehend a suspected felon, police vehicles may be used if no other suitable equipment is available.

3.  Barricading a roadway shall be strictly prohibited unless approved by a field supervisor or the Duty Lieutenant.  In the case of joint agency pursuits, barricading a roadway shall be

R 271995

1298

strictly prohibited unless specifically requested by the pursuing agency.

K. General Precautions

1. Due to the extreme hazards and potential risks for serious injury to pursuing officers, "boxing in", "ramming", or "bumping" from alongside are techniques which are generally ineffective and are not approved for use in any pursuit situation.

2. The key to a successful conclusion of a high speed pursuit and subsequent apprehension is dependent upon proper self-discipline and sound professional judgment.

R. 271895