[No. S063612. Dec. 16, 1999.]

SHARON P., Plaintiff and Appellant, v.
ARMAN, LTD., et al., Defendants and Respondents.

## COUNSEL

Law Offices of Peter B. O'Brien, Peter B. O'Brien and Kelly L. Duenckel for Plaintiff and Appellant.

Early, Maslach, Price & Baukol, Larry E. Robinson; Greines, Martin, Stein & Richland, Marc J. Poster and Robert A. Olson for Defendant and Respondent Arman, Ltd.

Acker, Kowalick & Whipple, Stephen Acker, Jerri Lynn Johnson and A. Gina Hogtanian for Defendant and Respondent APCOA, Inc.

Prindle, Decker & Amaro and Gary E. Yardumian as Amici Curiae on behalf of Defendant and Respondent APCOA, Inc.

Sharon L. Browne and Stephen R. McCutcheon, Jr., for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.

Susan Liebeler; Daniel J. Popeo; and Richard A. Samp for Washington Legal Foundation and Allied Educational Foundation as Amici Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendants and Respondents.

Brobeck, Phleger & Harrison and Nicholas B. Waranoff for International Council of Shopping Centers as Amicus Curiae on behalf of Defendants and Respondents.

Haight, Brown & Bonesteel, Roy G. Weatherup, Thomas N. Charchut, Rita Gunasekaran and Stephen M. Caine for Bank of America, N.T. & S.A., Wells Fargo Bank, N.A., National Parking Association, Parking Association of California and Association of Southern California Defense Counsel as Amici Curiae on behalf of Defendants and Respondents.

Crosby, Heafey, Roach & May, Paul D. Fogel and Bradley S. DeJean for California Contract Security Guard Association, American Protective

Services, Inc., Borg-Warner Protective Services Corp., and Pinkerton's, Inc., as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BAXTER, J.**—In *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*), we discussed the scope of a commercial landlord's duty of care and affirmed that it includes the taking of "reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures." (6 Cal.4th at p. 674.)

In this case, an unknown assailant sexually assaulted plaintiff at gunpoint in a commercial parking garage owned and operated by defendants. We must decide whether and to what extent defendants' duty of care to their tenants required that they provide security in the garage, when no assaults had occurred on the premises during the 10 years preceding the attack upon plaintiff. We conclude that the occurrence of a violent third party sexual assault in the subject garage was not sufficiently foreseeable to support such a requirement. We therefore reverse the contrary judgment of the Court of Appeal and remand the matter to that court with directions to enter judgment in favor of defendants.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Sharon P. conducted an accounting business in a Los Angeles office building. She paid a monthly fee to park in an assigned space in the underground parking garage reserved for tenants of the office building.

On Thursday, April 8, 1993, at approximately 11:00 a.m., plaintiff parked in her assigned space. As she was preparing to leave her car, a masked assailant came up from behind. He held a gun to her head, forced her back into her car, and sexually assaulted her.

Plaintiff sued defendant Arman, Ltd. (Arman), the owner of the premises, and defendant Apcoa, Inc., doing business as Parking Services, Inc. (Apcoa), which provided parking services for Arman. The complaint alleged, among other things, that defendants' failure to provide adequate security for users of the parking garage resulted in the attack upon plaintiff. Plaintiff sought compensatory damages for pain and suffering, severe emotional distress, medical expenses and loss of income.

Following discovery, defendants moved for summary judgment on the basis that neither of them owed a duty to plaintiff to make the garage more

secure because the attack on her was not reasonably foreseeable. The following evidence was submitted in support of and in opposition to defendants' motion.

Arman purchased the office building and parking garage in 1982. There is a bank on the ground floor of the building, with its entrance facing southwest. To the north of the building is a surface parking lot for building visitors. A driveway on the east side of the building leads to a one-level subterranean parking garage reserved for building tenants. The tenant garage is approximately 200 feet by 225 feet and contains 79 marked parking stalls. Apcoa's parking attendant operates from a booth at the northwest corner of the visitors' lot, several hundred feet from the driveway entrance to the tenant garage.

Zacaria Simantob, a general partner of Arman, was responsible for daily management of the building. He knew of no incident, from 1982 to April 8, 1993, in which anyone was physically assaulted on the premises or was confronted with a firearm in the tenant garage. He was informed that armed robberies had occurred at the bank on the ground floor but, to his knowledge, none had involved criminal activity in the garage or personal injury. The bank's internal records show it had been robbed seven times between February 1991 and January 1993, with one report of physical injury.

Records of the Los Angeles Police Department reflect that a total of 363 crimes, including 2 rapes, occurred in the 50 square blocks surrounding the office building for all of 1992. During the first quarter of 1993, just prior to plaintiff's assault, 72 crimes, but no rapes, were recorded.

Plaintiff submitted a declaration claiming that the overall condition of the tenant garage had deteriorated during the several months preceding her attack. It was not unusual for several lights to be out, which would leave the garage darkened in several places. On the day of her attack, the garage "had several darkened areas that provided vantage points from which someone lying in wait until after the morning influx of tenants could observe a lone woman arriving in her car as easy prey." Several darkened storage areas provided a place to hide. Plaintiff smelled urine at various times as she walked to and from the garage. She never saw defendants' employees monitor or inspect the garage, and in her view, the garage was not clean, well lit, safe or secure. After the attack, she learned that the security camera in the garage had not been working for several months.[1]

Defendants submitted a declaration from a private security consultant, retired Pasadena Police Chief Robert H. McGowan. McGowan inspected the

---

[1]Plaintiff's attorney examined the garage 18 months after the attack and submitted a declaration substantially similar to plaintiff's. Arman filed objections to the declarations of

tenant garage 17 months after plaintiff's assault and found the lighting "sufficient to clearly view from one side of the garage to the other in any direction." Although he conceded in his deposition that underground parking facilities are potential places for criminals to lie in wait, he believed that posting a security guard would have been an unreasonable burden on defendants because of the garage's small size and its minimal or no criminal activity, the relatively unobstructed view throughout the garage, and the presence of drivers entering and leaving. He also thought it would have been unreasonable to require operation of a closed circuit television and to require someone to monitor and investigate anything that looked suspicious. In McGowan's view, the bank robberies on the ground floor did not indicate any greater likelihood of a sexual assault crime occurring in the underground garage because the bank is located on the other end of the structure from the garage entrance and the "behavior" of a bank robber is to immediately escape the area, not to lie in wait for a victim.

The trial court granted the motions based upon the foreseeability analysis articulated in *Ann M., supra*, 6 Cal.4th 666. Although noting plaintiff's evidence of other crimes occurring in the surrounding area, the court found it significant that there was no evidence of crimes occurring within the parking garage. Judgment was entered in favor of defendants.

The Court of Appeal reversed by a divided vote. The majority determined that *Ann M.* was not controlling because commercial parking structures such as the one here are "inherently dangerous" and, by their very nature, facilitate the commission of crime and increase its likelihood. The majority concluded that, notwithstanding the absence of prior incidents of sexual assault in the tenant garage, criminal assaults on patrons of the garage were highly foreseeable as a matter of law given the inherently dangerous nature of commercial underground garages, the increasing number of criminal assaults occurring in such structures generally, the physical conditions existing at this particular garage, and the seven serious felonies (robberies) occurring at the ground floor bank during the two-year period preceding plaintiff's assault. After determining that the assault was foreseeable, the majority analyzed the policy considerations set forth in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] and concluded that defendants owed a duty of care to plaintiff to provide "reasonable" security in the tenant garage, which "might or might not include security guards." The matter was remanded to allow a jury to

plaintiff and her counsel in the trial court, but the record contains no rulings on those objections. We therefore deem the objections waived and view plaintiff's evidence as having been admitted in evidence as part of the record for purposes of the appeal. (*Ann M., supra*, 6 Cal.4th at p. 670, fn. 1; Code Civ. Proc., § 437c, subds. (b), (c).)

determine the issues of breach and causation based on the totality of the circumstances presented in the case.

The dissent criticized the majority for finding it foreseeable as a matter of law that criminal conduct will *always* occur in commercial underground parking structures. In its view, the majority improperly replaced *Ann M.*'s concept of duty based on foreseeability with an "inherently dangerous" condition theory. That theory, the dissent argued, would apply to numerous other types of properties, including residential parking structures, subways, office building hallways, residential building hallways, and movie theaters, and could be used to broadly expand the concept of foreseeability for other facilities such as all-night laundromats, emergency rooms, banks and college dormitories.

We granted defendants' petitions for review.

### DISCUSSION

To prevail on her action in negligence, plaintiff must show that defendants owed her a legal duty, that they breached the duty, and that the breach was a proximate or legal cause of her injuries. (*Ann M., supra*, 6 Cal.4th at p. 673.) Since defendants obtained summary judgment in their favor, "we review the record de novo to determine whether [they have] conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." (*Id.* at pp. 673-674.)

The existence of a duty is a question of law for the court. (*Kentucky Fried Chicken of Cal., Inc.* v. *Superior Court* (1997) 14 Cal.4th 814, 819 [59 Cal.Rptr.2d 756, 927 P.2d 1260]; *Ann M., supra*, 6 Cal.4th at p. 674.) Likewise, "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court." (*Ann M., supra*, 6 Cal.4th at p. 678.) The critical issue in this case is whether a sexual assault by a third party in the tenant garage was sufficiently foreseeable to support a requirement that defendants secure that area against such crime.

Plaintiff offers two principal rationales for affirming the judgment of the Court of Appeal. First, she contends that, because underground commercial parking structures are inherently dangerous, they carry with them a higher foreseeability of violent criminal attacks with a corresponding obligation to provide more than just minimal security measures. Although plaintiff claims she "is not asking for security guards," she asserts that requiring security

guards "is justified, should the court so find." Second, she argues that, even if the hiring of security guards was not required, the violent attack upon her was sufficiently foreseeable—due to the inherently dangerous nature of the parking garage, the prior bank robberies elsewhere on the premises and the statistical crime rate of the surrounding area—to impose upon defendants a minimal duty of protection. In plaintiff's words, "[s]imple things like a clean, brightly lit garage, with working security cameras, and periodic walk throughs [by existing personnel], all give the appearance that someone cares about this garage and sends a message to any potential criminal to go elsewhere."

A. *Ann M. and the Hiring of Security Guards*

■ By now it is well established that landowners must maintain their premises in a reasonably safe condition, and that in the case of a landlord, the general duty of maintenance includes "the duty to take reasonable steps to secure common areas against *foreseeable* criminal acts of third parties that are likely to occur in the absence of such precautionary measures." (*Ann M.*, *supra*, 6 Cal.4th at p. 674, italics added.)

To resolve whether the sexual attack upon plaintiff was sufficiently foreseeable to require the hiring of security guards, we consider first *Ann M.*, *supra*, 6 Cal.4th 666. In *Ann M.*, the plaintiff was raped while working at a photo store in a secluded area of the defendants' shopping center. (6 Cal.4th at pp. 670-671.) In opposition to the defendants' motion for summary judgment, the plaintiff presented evidence that, in the year preceding the attack, violent crimes had occurred in the census tract in which the shopping center was located. (6 Cal.4th at p. 671.) Transients loitering in the common areas had caused tenants and employees of the shopping center to be concerned about their safety. (*Ibid.*) There also was evidence that the defendants failed to provide security patrols despite a request by the merchants' association (6 Cal.4th at p. 672) and that assaults, purse snatchings and bank robberies may have occurred in the shopping center (6 Cal.4th at p. 671).

Emphasizing foreseeability as a "crucial factor" in determining the existence of duty, *Ann M.* determined that "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated."[2] (6 Cal.4th at p. 676.) *Ann M.* then revisited *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112 [211

[2]In addition to foreseeability, other factors considered by courts in determining the existence and scope of a duty in a particular case include " 'the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the

Cal.Rptr. 356, 695 P.2d 653] (*Isaacs*), which had abandoned the traditional "prior similar incidents" rule of foreseeability in favor of an approach that focused on the "totality of the circumstances." (*Ann M., supra,* 6 Cal.4th at pp. 677-678.) In a departure from prior case law, *Isaacs* had concluded that foreseeability of harm ordinarily should be determined upon consideration of "what is reasonable in light of all the circumstances" and that the absence of prior similar incidents of crime did not negate the existence of a duty. (*Isaacs, supra,* 38 Cal.3d at p. 135.) The occurrence of prior similar incidents was deemed "helpful" to determine foreseeability, but "not required to establish it." (*Ibid.*)

As noted in *Ann M.*, lower courts had questioned the wisdom of *Isaacs*'s totality of the circumstances approach and California appeared to be the lone jurisdiction utilizing such a rule in the business landowner context. (*Ann M., supra,* 6 Cal.4th at pp. 677-678.) *Ann M.* was not reluctant to revisit *Isaacs* because viewing the totality of the circumstances had been unnecessary to the result in that case. (6 Cal.4th at p. 678.) That is, the foreseeability factor could have been met in *Isaacs* under the traditional rule requiring prior similar incidents. (*Ibid.*)

■ In contrast to *Isaacs, Ann M.* concluded that, in light of the vagueness of the obligation to provide patrols adequate to deter crime and the significant monetary and social costs that are implicated in imposing such an obligation, a "high degree of foreseeability" is required in order to find that the scope of a landowner's duty of care includes the hiring of security guards to protect against violent crime by third parties. (6 Cal.4th at p. 679.) *Ann M.* cautioned that the requisite degree of foreseeability "rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (*Ibid.*, fn. omitted.) "To hold otherwise," *Ann M.* emphasized, "would be to impose an unfair burden upon landlords and, in effect, would force landlords to become the insurers of public safety, contrary to well-established policy in this state." (*Ibid.*)

Applying its analysis to the record, *Ann M.* determined that the plaintiff there failed to establish the high degree of foreseeability necessary to require the posting of security guards in the common areas of the shopping center. (6 Cal.4th at pp. 679-680.) First, there was no evidence the defendants had

---

injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ann M., supra,* 6 Cal.4th at p. 675, fn. 5, quoting *Rowland* v. *Christian, supra,* 69 Cal.2d at p. 113.) These other factors may dictate against expanding the scope of a landowner's duty to include protecting against third party crime, even where there is sufficient evidence of foreseeability.

notice of the assaults, purse snatchings and bank robberies allegedly occurring on the premises. Second, even assuming there had been notice, the plaintiff had conceded that the prior crimes were not similar in nature to the violent assault she suffered. Finally, neither the evidence regarding the presence of transients, nor the evidence of the statistical crime rate of the surrounding area, was of a type sufficient to establish the requisite foreseeability. (6 Cal.4th at p. 680.)

 If we were to apply the foregoing analysis in the present case, defendants were not required to provide security guards in their garage. Significantly, the prior robberies, which all specifically targeted a bank elsewhere on the premises and did not involve violent attacks against anyone, were not sufficiently similar to the sexual assault inflicted upon plaintiff to establish a high degree of foreseeability that would justify the imposition of such an obligation. (*Ann M.*, *supra*, 6 Cal.4th at p. 680.) Moreover, the analysis forecloses the possibility that evidence of the statistical crime rate of the surrounding 50-block area, even if considered in combination with the bank robberies and the evidence that a person or persons urinated and slept in or about the garage prior to the assault, would be sufficient to establish the requisite foreseeability. (*Ibid.*)

Plaintiff argues that her injury was foreseeable, regardless of the absence of prior violent attacks on the premises. She relies on a footnote in *Ann M.* in which we commented: "Ann M. offered no evidence to show that, like a parking garage or an all-night convenience store, a retail store located in a shopping center creates ' "an especial temptation and opportunity for criminal misconduct." ' (*Gomez* v. *Ticor* [(1983) 145 Cal.App.3d 622, 628 [193 Cal.Rptr. 600]] [victim killed returning to car in parking garage]; *Cohen* v. *Southland Corp.* (1984) 157 Cal.App.3d 130, 141 [203 Cal.Rptr. 572] [robbery at all-night convenience store].) Therefore, we need not consider in this case whether some types of commercial property are so inherently dangerous that, even in the absence of prior similar incidents, providing security guards will fall within the scope of a landowner's duty of care." (*Ann M.*, *supra*, 6 Cal.4th at p. 680, fn. 8.) In addition, plaintiff quotes extensively from *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622 [193 Cal.Rptr. 600] (*Gomez*) to argue that violent crime in an underground commercial parking garage is highly foreseeable because the very nature of such structures makes them prone to third party criminal attacks on their patrons and users.

Upon careful deliberation, we reject the view that underground parking structures are "so inherently dangerous that, even in the absence of prior similar incidents, providing security guards will fall within the scope of a landowner's duty of care." (*Ann M.*, *supra*, 6 Cal.4th at p. 680, fn. 8.) Several considerations factor into our decision.

First, we are not directed to any evidence or authorities from which we might confidently conclude that all underground parking structures, regardless of their individual physical characteristics and locations, are prone to violence and therefore are inherently dangerous in nature.[3] Moreover, a survey of the decisions cited to us by the parties and amici curiae indicates that aboveground commercial and residential buildings are just as prone to violent sex crimes by unknown third parties. (E.g., *Ann M.*, *supra*, 6 Cal.4th at p. 671 [mall store]; *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 498 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] [condominium unit]; *Pamela W.* v. *Millsom* (1994) 25 Cal.App.4th 950, 953 [30 Cal.Rptr.2d 690] [condominium unit]; *Riley* v. *Marcus* (1981) 125 Cal.App.3d 103, 105 [177 Cal.Rptr. 827] [apartment]; *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324, 325 [176 Cal.Rptr. 494] [apartment lobby]; *Wingard* v. *Safeway Stores, Inc.* (1981) 123 Cal.App.3d 37, 39 [176 Cal.Rptr. 320] [commercial warehouse]; *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901, 903 [172 Cal.Rptr. 528] [apartment]; *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 802 [142 Cal.Rptr. 487] [apartment].) In the absence of solid support for the categorical conclusion that all parking garages are inherently dangerous, and are distinctly so in comparison to other types of premises, we are reluctant to single out garage owners for imposition of the substantial monetary and social costs associated with the hiring of security guards.

Second, *Gomez*, *supra*, 145 Cal.App.3d 622, does not support adoption of a per se rule of foreseeability in cases involving underground parking structures. The *Gomez* court opined that violent crime in a parking garage *may* be foreseeable because: (1) cars and car stereos and contents located in such garages present tempting targets for thieves; (2) the "high walls, low ceilings and the absence of the cars' owners" in garages give thieves and vandals time and privacy to complete their tasks; (3) the "deserted, labyrinthine nature" of garages, "especially at night, makes them likely places for robbers and rapists to lie in wait"; and (4) a garage patron who interrupts such crimes in progress could be violently attacked by the criminal. (145 Cal.App.3d at p. 628.) But *Gomez* did not hold that the foregoing considerations render violent crime in parking structures foreseeable as a matter of law, either in general or in the particular garage at issue.

Unlike the instant case, *Gomez* involved a garage patron who was shot when he inadvertently interrupted a robbery occurring in an underground

---

[3]The record on appeal contains no statistical data comparing the crime rate in parking garages with the rates for other types of properties. In this court, the parties and the dissent refer to various criminal victimization statistics published by the United States Department of Justice. As a procedural matter, we decline to consider such statistics since a proper request for judicial notice was never made. In any event, the conclusions drawn from the statistics are reasonably subject to dispute.

garage. There was no indication in *Gomez* that any crime had been committed in the garage previously, but there was evidence of at least 16 acts of theft and vandalism in the building above the garage. (145 Cal.App.3d at p. 628.) In light of that evidence, the *Gomez* court concluded that a jury could find that acts of theft and vandalism were foreseeable in the parking structure and that a patron who interrupted an act of theft or vandalism while returning to a parked car would be subject to violent attack by the thief or vandal. (*Ibid.*) The court found it insignificant that the patron there had interrupted a robbery, rather than an act of theft or vandalism, since "the fatal incident fell within the scope of the alleged foreseeable harm, i.e., attack on a patron who interrupts a criminal act." (145 Cal.App.3d at p. 628, fn. 1.)

To buttress its conclusion regarding foreseeability of the incident, the *Gomez* court added: "[I]n its very operation of a parking structure, defendant may be said to have created 'an especial temptation and opportunity for criminal misconduct,' thus increasing the foreseeability of the attack. (Prosser, Torts (4th ed. 1971) p. 174.) In making this observation we note the unique nature of a parking complex, which invites acts of theft and vandalism. In such structures, numerous tempting targets (car stereos, car contents, the cars themselves) are displayed for the thief; high walls, low ceilings and the absence of the cars' owners allow the thief or vandal to work in privacy and give him time to complete his task. Such circumstances increase the likelihood of criminal misconduct. In addition, the deserted, labyrinthine nature of these structures, especially at night, makes them likely places for robbers and rapists to lie in wait. Robbery, rape, and violent consequences to anyone who interrupts these crimes, may thus also be foreseeable." (*Gomez, supra*, 145 Cal.App.3d at p. 628.)

As a preliminary matter, we observe *Gomez* erred in holding that foreseeability, when analyzed to determine the existence or scope of a duty, is a question of fact for the jury. (Compare *Gomez, supra*, 145 Cal.App.3d at p. 628, with *Ann M., supra*, 6 Cal.4th at p. 678.) More significantly, *Gomez*, upon close review, fails to persuade us that rapists and robbers are more likely to lie in wait in underground parking structures than elsewhere or that the operation of an underground parking structure creates " 'an *especial* temptation and opportunity' " for sexual assaults and other crimes of a violent nature.[4] (See *Gomez, supra*, 145 Cal.App.3d at p. 628, italics added.)

In *Ann M.*, we acknowledged the unfortunate circumstance that "[i]t is difficult, if not impossible, to envision any locale open to the public where

---

[4]As indicated, *Gomez* credited Prosser on Torts for the "especial temptation" phrase. (*Gomez, supra*, 145 Cal.App.3d at p. 628, quoting Prosser, Torts (4th ed. 1971) p. 174.) The phrase also appears in the latest edition of Prosser and Keeton on Torts. (Prosser & Keeton, Torts (5th ed. 1984) § 33, p. 201.) Neither treatise posits that certain types of premises create

the occurrence of violent crime seems improbable." (*Ann M., supra*, 6 Cal.4th at p. 678.) Not only is random, violent crime "endemic in today's society" (*ibid.*), but one can easily think of a host of locations and businesses that, for one reason or another, present attractive opportunities to the criminal element of society. As one commentator has observed: "Because all businesses attract crime to some extent, they could all be characterized as 'inherently dangerous.' At various times, courts have described parking facilities, all-night laundromats, emergency room facilities, banks, and college dormitories as being facilities that attract crime. The mere fact that a crime has occurred almost always allows one to draw the conclusion, after the fact, that the premises were inherently dangerous. Moreover, any duty premised on the idea that the business attracts crime ignores the fact that many such businesses are economically viable precisely because they do not require any on-site labor. Once proprietors are forced to provide security guards at all-night laundromats or at bank teller machines, those operations cease to become profitable. It serves no one to impose a duty which, rather than protecting customers, forces the businesses which they frequent to close." (Kaufman, *When Crime Pays: Business Landlords' Duty to Protect Customers from Criminal Acts Committed on the Premises* (1990) 31 S. Tex. L.Rev. 89, 112-113, fns. omitted.) Were we to find that the occurrence of violent crime in commercial underground parking structures is highly foreseeable as a matter of law, we would be opening the door to virtually limitless litigation over what other types of property could also be characterized as "inherently dangerous."

Moreover, while *Gomez* recognized that violent crime *might* be foreseeable in underground parking structures, it implicitly rejected the notion that such structures are so inherently dangerous that security guards are required to safeguard their users. Indeed, the *Gomez* court held that, at most, the garage owner there would have been required to take what it viewed as "minimal precautions" against crime, i.e., maintaining operational security monitors and intercoms. (*Gomez, supra*, 145 Cal.App.3d at pp. 632-633.)

Finally, adoption of the view that violent crime in underground parking structures is highly foreseeable as a matter of law would lead to incongruous

---

an especial temptation and opportunity for criminal misconduct, but the more recent treatise cites two cases in which the particular conduct of the defendant did so. (*Id.* at p. 201, fn. 86.) One involved a vehicular death caused by an intoxicated driver after the police had detained the driver but then negligently permitted him to remain in his car with the keys in the ignition. (*Green* v. *City of Livermore* (1981) 117 Cal.App.3d 82 [172 Cal.Rptr. 461].) The other involved deaths from a bomb made by thieves with dynamite that the defendant had negligently stored. (*Bridges* v. *Kentucky Stone Co., Inc.* (Ind.Ct.App. 1981) 408 N.E.2d 575, vacated (Ind. 1981) 425 N.E.2d 125.) Of those few cases involving parking lots or garages that are cited in the discussions accompanying the "especial temptation" phrase, none holds that such premises are inherently dangerous.

results. In the present case, for instance, the record reflects that the underground tenant garage had no reported incidents of crime for 10 years prior to the assault upon plaintiff. The only evidence of prior criminal acts on the premises consisted of the seven bank robberies on the street level of the office building located above the parking structure. As already discussed, application of *Ann M.*'s analysis to this record leads to the conclusion that defendants' duty of care did not include the hiring of security guards for the garage because the bank robberies were not sufficiently similar to the sexual assault crime to establish a high degree of foreseeability. Nor would such a duty be found if the assault on plaintiff had occurred in other areas of the office building instead of the garage (e.g., in a common hallway or at plaintiff's place of business).

Yet, under the rule advocated by plaintiff, defendants would be saddled with the significant burden of hiring security guards to patrol the underground garage simply because it is an underground garage, without regard to the dissimilarity of the prior criminal incidents elsewhere on the premises or to the garage's 10-year history of crime-free existence. Indeed, such a rule would burden virtually all owners of underground commercial garages in contravention of settled state policy that they, as landlords, should not be forced to become the insurers of public safety. (See *Ann M.*, *supra*, 6 Cal.4th at p. 679.)

B. *Other Security Measures*

In *Ann M.*, we reaffirmed our commitment to the principle that the scope of a landowner's duty to provide protection against third party crime is determined in part by balancing the foreseeability of the harm against the burden to be imposed. (6 Cal.4th at p. 678.) We explained: " ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' Or, as one appellate court has accurately explained, duty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures. (*Gomez* v. *Ticor*, *supra*, 145 Cal.App.3d at p. 631.)" (*Ann M.*, *supra*, 6 Cal.4th at pp. 678-679.)

Plaintiff relies on the foregoing passage to argue that, even if defendants were not required to hire security guards because a high degree of foreseeability cannot be established, the occurrence of violent third party crime in underground garages is sufficiently foreseeable that defendants

were required to provide protection by simple and less burdensome means. According to plaintiff, defendants were under a "minimal obligation" to keep the tenant garage brightly lit and clean, to hook up a previously installed security camera located over the elevator of the garage, and to require existing personnel to periodically walk through the garage. Plaintiff's reasoning is flawed.

In the first place, it is questionable whether plaintiff's proposed measures would have been effective to protect against the type of violent assault that occurred here. The record, for instance, contains no evidence that the security camera at issue was even aimed toward the area of the parking garage where plaintiff was attacked. Moreover, surveillance cameras do not deter all crime and criminals do not confine their activities to locations that are untidy or unkempt.

It is also questionable whether the identified measures would have been any less burdensome than the hiring of security guards. As defendants correctly point out, surveillance cameras may be ineffectual to protect against crime unless there are employees who are available to continuously monitor video transmissions and respond effectively when suspicious or criminal behavior is observed. Similarly, plaintiff's contention that garage owners and operators have a "minimal obligation" to arrange periodic walk-throughs of the garage by existing personnel assumes that they have workers readily available who are trained to deal with violent crime. But even if such employees are available and higher monetary costs are not implicated, a requirement that owners and operators of commercial underground garages provide "adequate" security monitoring through existing personnel would be vague and impossible to define, especially where, as here, a particular garage has been free of crime for a substantial period of time and there is no evidence that garage users ever raised the issue of personal safety with the owner or the operator.

In addition, a number of courts have criticized the view that "adequate lighting" is a simple and well-defined security measure that is effective in preventing crime-related injuries. (E.g., *7735 Hollywood Blvd. Venture* v. *Superior Court, supra,* 116 Cal.App.3d at p. 905 [noting the vagueness of a duty to provide adequate lighting]; *Kwaitkowski* v. *Superior Trading Co., supra,* 123 Cal.App.3d at p. 333 [agreeing that the utility of a light as a security measure is questionable]; cf. *Gomez, supra,* 145 Cal.App.3d at p. 632 [suggesting that, unlike operational security monitors and intercoms, light bulbs may have no appreciable effect in preventing or warning of crimes].) Other courts, moreover, have rejected claims of abstract negligence pertaining to the lighting and maintenance of property where no connection

to the alleged injuries was shown.[5] (E.g., *Nola M.* v. *University of Southern California* (1993) 16 Cal.App.4th 421, 435-439 [20 Cal.Rptr.2d 97] [even if defendant owed a duty of protection, lighting and untrimmed foliage and trees did not proximately cause plaintiff's injury where there was no evidence that her attacker hid in the shadows or behind a tree or bush]; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 211-212 [223 Cal.Rptr. 645] [lighting was not a proximate cause of plaintiff's injury because she saw her attacker standing in the light and staring at her prior to the attack]; *Noble* v. *Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 915-916 [214 Cal.Rptr. 395] [even assuming a duty to protect, plaintiffs must prove more than abstract negligence unconnected to the injury].)

Setting aside concerns regarding the efficacy and burden of plaintiff's proposed security measures and questions regarding the issue of proximate cause, the record remains deficient in establishing the foreseeability of violent attacks such as the one against plaintiff. Viewing the record in the light most favorable to plaintiff, it shows that robbers repeatedly targeted a bank on the ground floor of the subject premises in the 27-month period preceding the sexual assault. Apart from those incidents, there is no evidence of other prior crimes against property or persons on the premises, either in the office building or in the underground parking garage. Since sexual assault is not a reasonably foreseeable risk associated with bank robberies (see *People* v. *Nguyen* (1993) 21 Cal.App.4th 518, 533 [26 Cal.Rptr.2d 323] [observing that rapes consummated during the robbery of a bank appear to be a rarity]), the bank robberies did not portend the vicious assault committed upon plaintiff.

Two decisions, *Cohen* v. *Southland Corp.* (1984) 157 Cal.App.3d 130 [203 Cal.Rptr. 572] (*Cohen*) and *Gomez, supra*, 145 Cal.App.3d 622, support a somewhat broader concept of foreseeability with regard to assaults occurring on properties that have some history of nonassaultive crime. In those cases, the courts indicated it would be reasonable to anticipate that a person would be subject to violent attack if he or she were to be present at an otherwise foreseeable crime on the premises or if he or she were to interrupt such a crime in progress.[6] Thus, they reasoned, violent assaults that occur in such a manner may be sufficiently foreseeable to require the taking of "minimal"

---

[5]In this case, plaintiff contends that inadequate lighting in the tenant garage resulted in several darkened areas that provided hiding places and vantage points from which her attacker could have been lying in wait for a victim like her to arrive. The record, however, contains no evidence that her attacker actually used any of the darkened areas to facilitate his assault.

[6]We accept, for purposes of argument, *Gomez*'s apparent conclusion that a crime of robbery may be foreseeable in a parking structure when at least 16 crimes of theft or vandalism have occurred on the premises in the office building above the structure. (See *Gomez, supra*, 145 Cal.App.3d at p. 628.)

security measures even though the subject premises had never before experienced an assault or injury-producing crime. (*Cohen, supra,* 157 Cal.App.3d at pp. 139-140, 142-143; *Gomez, supra,* 145 Cal.App.3d at p. 628.) Here, of course, plaintiff offered no evidence suggesting that her attack had any connection to an otherwise foreseeable crime on the premises (i.e., bank robbery). Accordingly, the incident falls outside even the broader scope of reasonable foreseeability contemplated in *Cohen* and *Gomez.*

Finally, the police department records of crimes occurring in the 50 square blocks surrounding the parking garage do not aid plaintiff's case. On this point, we note that *Ann M.* left open the possibility that violent crime may be foreseeable on a business property in the absence of prior similar incidents if violent crimes previously occurred on the premises of a substantially similar business establishment in its immediate proximity. (*Ann M., supra,* 6 Cal.4th at p. 679, fn. 7.) But the evidence provided here contains no information regarding the location of any of the reported crimes within the identified sector and no indication of their proximity to the garage. Nor has plaintiff shown that defendants were aware of the police department statistics. In short, such evidence provides no tenable basis for establishing foreseeability.[7]

We have not overlooked the fact that *Frances T.* v. *Village Green Owners Assn., supra,* 42 Cal.3d 490, *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193], and *Slapin* v. *Los Angeles International Airport* (1976) 65 Cal.App.3d 484 [135 Cal.Rptr. 296], allowed victims of violent crime to maintain tort actions premised upon theories of insufficient lighting or maintenance of property. Those decisions, however, were all decided in the context of demurrers to complaints containing allegations, which, if proved true, would establish the foreseeability of crime on the premises. (*Frances T.* v. *Village Green Owners Assn., supra,* 42 Cal.3d at p. 503 [rape victim's complaint alleged facts

---

[7]The record in this case differs substantially from that in *Clohesy* v. *Food Circus Supermkts.* (1997) 149 N.J. 496 [694 A.2d 1017] (*Clohesy*), a case in which the New Jersey Supreme Court held it was reasonably foreseeable that a customer of a large supermarket could suffer some injury in its parking lot such that the supermarket owner had a legal duty to provide reasonable security in the lot. In contrast to the situation here, the record in *Clohesy* contained evidence of approximately 60 criminal incidents either on or in close proximity to the supermarket's premises over the 2½-year period that preceded the deceased customer's kidnapping and murder in 1991. (694 A.2d at p. 1021.) The offenses consisted of thirty shopliftings, twelve thefts either inside the store or in the parking lot, four driving while intoxicated offenses, four disorderly conduct offenses, four assaults, one criminal mischief, one trespassing, and one possession of a controlled dangerous substance. (*Ibid.*) In addition, the record reflected a significant increase in the incidents occurring on the supermarket's premises (four in 1989; seven in 1990; thirteen in 1991). (*Ibid.*) In light of the obvious dissimilarities, we do not view *Clohesy* as supporting a finding of foreseeability here.

demonstrating the defendant's knowledge that crimes were being committed against condominium residents, that the plaintiff's unit had been recently burglarized, and that additional lighting in the common areas was needed and could aid in deterring criminal conduct, especially break-ins of units]; *Peterson* v. *San Francisco Community College Dist.*, *supra*, 36 Cal.3d at pp. 814-815 [victim of an attempted rape on a community college campus was entitled to pursue action under Government Code section 835 and to prove that the defendant's failure to warn, trim foliage, or take other reasonable protective measures was the proximate cause of her injuries in light of specific allegations that the defendant was aware that prior similar assaults had occurred in the same location]; *Slapin* v. *Los Angeles International Airport*, *supra*, 65 Cal.App.3d at p. 489 [clarifying, in the context of an action under Government Code section 835, that the question whether the alleged dangerous condition caused by insufficient lighting created a reasonably foreseeable risk of injury would hinge on the plaintiffs' ability "to establish a history of crime at the parking lot"]; see also *Penner* v. *Falk* (1984) 153 Cal.App.3d 858, 866-867 [200 Cal.Rptr. 661] [complaint sufficiently alleged landlord's awareness of violent crime on the premises].) By contrast, this case comes to us on a motion for summary judgment and plaintiff has presented her proof. That proof, we conclude, is insufficient to establish foreseeability.

It is difficult to quarrel with the abstract proposition that the provision of improved lighting and maintenance, operational surveillance cameras and periodic walk-throughs of the tenant garage owned and operated by defendants might have diminished the risk of criminal attacks occurring in the garage. But absent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location, we cannot conclude defendants were required to secure the area against such crime.

### DISPOSITION

The contrary judgment of the Court of Appeal is reversed and the matter is remanded to that court with directions to enter judgment in favor of defendants.

George, C. J., Kennard, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—Like the majority, I fully embrace the proposition that "the provision of improved lighting and maintenance, operational surveillance cameras and periodic walk-throughs of the tenant garage owned and operated by defendants might have diminished the

risk of criminal attacks occurring in the garage." (Maj. opn., *ante*, at p. 1199.) Such measures, or others that might readily be imagined, such as strategically placed intercoms or security alarms, clearly would enhance any garage user's sense of personal safety and security when parking his or her car and traversing the facility to an exit.

Notwithstanding the above, a landlord has no absolute duty, in the abstract, to take some or all such measures; rather, a landlord's "duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 676 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*), citing *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 501 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447].) As we stated in *Ann M.*, "In this, as in other areas of tort law, foreseeability is a crucial factor in determining the existence of duty." (6 Cal.4th at p. 676, citing *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 123 [211 Cal.Rptr. 356, 695 P.2d 653] (*Isaacs*); *Lopez* v. *McDonald's Corp.* (1987) 193 Cal.App.3d 495, 506 [238 Cal.Rptr. 436].) Foreseeability, as regards duty, rests on more than the mere possibility that taking any one or a combination of assorted measures *might* diminish the risk of criminal attacks. Rather, "duty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M., supra*, at p. 679, citing *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 631 [193 Cal.Rptr. 600].)

Consequently, I believe the majority correctly adheres to the test set forth in *Ann M.*, when it states that, "absent any prior similar incidents *or other indications* of a reasonably foreseeable risk of violent criminal assaults in that location, we cannot conclude defendants were required to secure the area against such crime." (Maj. opn., *ante*, at p. 1199, italics added; see *Ann M., supra*, 6 Cal.4th at p. 679 & fn. 7.)

In the instant case, the record fails to show not only any prior similar incidents; it fails as well to show any "other indications of a reasonably foreseeable risk of violent criminal assaults" in the garage. The only criminal activity in close proximity to the garage consisted of seven robberies, over a period of two years, in a bank aboveground and at some distance from the parking garage entrance. The possibility of a robbery in a bank does not raise the possibility of a rape in a distant, or even a nearby, garage.

Significantly, before this incident the garage had been crime free for more than 10 years. The garage was frequented, moreover, not by the occasional

patron, but by regular customers who were tenants in the office building above. Plaintiff and her counsel assert the garage showed signs of neglect, yet, whatever the degree of neglect in its maintenance, such was insufficient, insofar as the record discloses, to cause the tenants—likely repeat, even daily, users of the facility—in the interests of their personal safety or sense of security, to complain to the owner or operator about any perceived risk of harm or deterioration in the condition of the premises. Given, therefore, the lack of any prior similar incidents, the lack of any expressed concern by regular users of the garage, and the lack of *any other indications* of a reasonably foreseeable risk of violent criminal assaults, either on the premises or in reasonable proximity thereto, I agree the landlord here did not have a legal duty to take precautions against such criminal activity.

I therefore concur in the majority's reversal of the judgment below.

I dissent, however, from the majority opinion to the extent its exaggerated emphasis on, and separate treatment of, security guards, a measure the majority acknowledges plaintiff "is not asking for" (see maj. opn., *ante*, at p. 1188), may be read analytically to distinguish the question whether a landlord is obligated to provide such guards from the question of scope of duty, generally. There is no such analytical distinction. The scope of a landlord's duty "to take reasonable steps to secure common areas against foreseeable criminal acts of third parties" (*Ann M., supra*, 6 Cal.4th at p. 674) depends on the circumstances and, as previously noted, "is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures" (*id.* at p. 679). In *Ann M.*, in a context where the plaintiff contended security patrols were the "first line of defense" the landlord owed (*id.* at p. 673), we determined a high degree of foreseeability was required to find the provision of security guards to be within the scope of the landlord's duty. In so doing, we "revisit[ed]" and "refin[ed]" *Isaacs, supra*, 38 Cal.3d 112, which had determined that prior similar incidents were relevant, but not essential, to the existence of such a duty. We did not, however, thereby create a special form of duty analysis for such claims. Both "before and after our decision in *Isaacs*, we have recognized that the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed." (*Ann M., supra*, at p. 678.)

I further dissent insofar as the majority opinion may be read impliedly to reinstitute a pure prior similar incidents rule such as we demonstrated in *Isaacs* is "fatally flawed in numerous respects." (*Isaacs, supra*, 38 Cal.3d at p. 125; see generally, *id.* at pp. 125-126.) As the majority acknowledges, we have "left open the possibility that violent crime may be foreseeable on a

business property in the absence of prior similar incidents if violent crimes previously occurred on the premises of a substantially similar business establishment in its immediate proximity" (maj. opn., *ante*, at p. 1198, citing *Ann M.*, *supra*, 6 Cal.4th at p. 679, fn. 7) or where there are "other indications of a reasonably foreseeable risk of violent criminal assaults in that location" (maj. opn., *ante*, at p. 1199). In this case, therefore, the absence of prior incidents similar to the attack on plaintiff is relevant, but not dispositive, and the majority's conclusion "that defendants' duty of care did not include the hiring of security guards for the garage because the bank robberies were not sufficiently similar to the sexual assault crime to establish a high degree of foreseeability" (maj. opn., *ante*, at p. 1195) is correct, but only because the record discloses no "other [legally sufficient] indications of a reasonably foreseeable risk of violent criminal assaults in that location" (*id.* at p. 1199).[1]

Emphatically, a landlord is not, as the prior similar incidents rule would have it, entitled to one free assault before the failure to take appropriate security measures subjects him or her to the risk of civil liability.

**MOSK, J.**—I dissent. To hold that the operator of *this* underground garage, with its alleged hiding places, missing lights, broken security cameras, absence of supervision, and other evidence of neglect, lacked any duty as a matter of law to maintain the premises in a fit and safe condition for business so as not to attract crime—and implicitly that any garage operator lacks such a duty—defies logic. And the result is demonstrably unjust.

## I

Sharon P. alleged that she was sexually assaulted in an underground parking garage. She claimed in essence that the garage's dilapidation attracted her assailant. The trial court ruled that plaintiff was not owed a duty of care and entered summary judgment for defendants. It reasoned that the crime was not sufficiently foreseeable to give rise to a duty of care.

## A

To recover for the consequences of another's purportedly wrongful action, the victim must show that the tortfeasor owed a duty of care, that it breached

---

[1] I agree with the majority that plaintiff's proffered proof in this case—police department records of crimes during the previous 15 months in the 50 square blocks surrounding the garage (recording 2 rapes out of 363 crimes)—does not provide a tenable basis for establishing foreseeability. (Maj. opn., *ante*, at pp. 1186, 1198.)

its duty, that the breach proximately caused the harm, and that the victim is entitled to money damages as a result. (*Artiglio* v. *Corning, Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) This is the bedrock of negligence law. Of these elements, ordinarily only duty is a question of law to be resolved by a court.[1] Thus, we routinely say that the existence of a duty is a legal question. (*Kentucky Fried Chicken of Cal., Inc.* v. *Superior Court* (1997) 14 Cal.4th 814, 819 [59 Cal.Rptr.2d 756, 927 P.2d 1260] (*Kentucky Fried Chicken*).) The requirement of duty gives courts the ability to limit liability for reasons of social policy (e.g., *Hoff* v. *Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 933 [80 Cal.Rptr.2d 811, 968 P.2d 522]), lest the theoretically infinite reach of tort liability paralyze society with a rule that any action eventually leading to harm, no matter how remotely, is actionable. Thus, an actor has no legal duty to avoid unforeseeable harm. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*).)

In this case, however, the majority wrongly decide that defendants had no duty to maintain the premises so as not to guard against attacks on people therein. That is utterly contrary to settled legal principles. Civil Code section 1714 provides in relevant part: "Every one is responsible . . . for an injury occasioned to another by his want of ordinary care or skill in the management of his property . . . ." Thus, "California law requires landowners to maintain land in their possession and control in a reasonably safe condition." (*Ann M., supra,* 6 Cal.4th 666, 674.) This obligation "includes a 'duty to take affirmative action to control [i.e., guard against] the wrongful acts of third persons which threaten invitees where the occupant has reasonable cause to anticipate [i.e., foresee] such acts and the probability of injury resulting therefrom.' " (*Kentucky Fried Chicken, supra,* 14 Cal.4th 814, 819.) In turn, " 'foreseeability . . . includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' . . . Moreover, it is settled that what is required to be foreseeable is the general character of the event or harm . . . [and] not its precise nature or manner of occurrence." (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58 [192 Cal.Rptr. 857, 665 P.2d 947].)

As pertinent to a case such as this, in which a victim sues the possessor of land for a crime committed against her by a third party, "duty . . . is

---

[1]Whether defendants *breached* their duty is a question of fact for the jury to decide. (*Mexicali Rose* v. *Superior Court* (1992) 1 Cal.4th 617, 633 [4 Cal.Rptr.2d 145, 822 P.2d 1292].) So are the questions whether defendants' conduct proximately caused plaintiff's injuries (*Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 520 [150 Cal.Rptr. 1, 585 P.2d 851]), and the amount of compensation owed for them (*Torres* v. *City of Los Angeles* (1962) 58 Cal.2d 35, 53 [22 Cal.Rptr. 866, 372 P.2d 906]).

determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M.*, *supra*, 6 Cal.4th 666, 679.) Applying *Ann M.*'s balancing test, one observes that a land possessor's neglect of its property may increase the foreseeability of third party criminal conduct, and thus create a duty to ameliorate any dilapidation or deterioration that invites violent crime. (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 129 [211 Cal.Rptr. 356, 695 P.2d 653]; cf. *Ann M.*, *supra*, 6 Cal.4th 666, 677-679 & fns. 6 & 7.)[2] Foreseeability increases, as does the burden imposed on the land possessor to guard against third parties' criminal acts, to the extent that those three factors were present and would notify a reasonable land possessor of the potential that its invitees could be injured.

This case comes before us on summary judgment. As is well known, a summary judgment motion is properly granted if the moving party meets the burden of showing that there are no triable issues of fact and that it is entitled to judgment as a matter of law. (*Artiglio* v. *Corning, Inc.*, *supra*, 18 Cal.4th 604, 612.) Thus if, but only if, the land possessor meets the burden of showing that, *as a matter of law*, the character of the property and the history of crime on the property and in the vicinity, viewed in the aggregate, would not give notice to a reasonable land possessor of the potential for harm to its invitees, is the summary judgment motion properly granted.

The foregoing burden, of course, is and should be difficult to meet. Summary judgment is not "a substitute for a full trial." (*Hayman* v. *Block* (1986) 176 Cal.App.3d 629, 639 [222 Cal.Rptr. 293].) "The purpose of the summary judgment procedure is not to try the issues but merely to discover, through the medium of affidavits, whether there are issues to be tried and whether the parties possess evidence which demands the analysis of trial." (*Colvin* v. *City of Gardena* (1992) 11 Cal.App.4th 1270, 1275 [15 Cal.Rptr.2d 234].) Especially in a factually complex case such as this, the parties cannot be expected to present all of their evidence in the form of affidavits.

Applying the principles outlined above to the alleged facts of this case, it is clear that granting the summary judgment motion was improper. It was for

---

[2]In *Isaacs* we held that whether a reasonable land possessor would have foreseen the possibility of criminal conduct depends on the following factors, among others: "the nature, condition and location of the defendant's premises." (*Isaacs* v. *Huntington Memorial Hospital*, *supra*, 38 Cal.3d 112, 129.) *Ann M.* expressed doubt about a totality of the circumstances test contained in *Isaacs*, but did not overrule *Isaacs* in this regard; indeed, *Ann M.* noted that under circumstances similar to those Sharon P. alleges here, a plaintiff might establish a high degree of foreseeability. (*Ann M.*, *supra*, 6 Cal.4th 666, 679, fn. 7.)

a jury to evaluate the conflicting evidence and determine whether, under all of the circumstances, defendants knew of or should have anticipated the possibility of criminal conduct in their parking garage, and failed to guard against it or even invited it by letting the premises deteriorate.

But the notion that there are limits to the limits on tort liability that courts may impose is absent from the majority's analysis. They impose an iron rule of no potential liability despite plaintiff's strong evidence of neglected and unsupervised property. They err.[3]

B

The majority rest their decision on the principle of unforeseeability. But their reasoning is difficult to understand, and I believe they confuse the two different ways in which foreseeability is applied. To be sure, "[t]he problem is complex, and has bedeviled many." (*Brewer* v. *Teano* (1995) 40 Cal.App.4th 1024, 1030 [47 Cal.Rptr.2d 348].) The majority may now count themselves among them.

The majority contend that foreseeability, when used as a component of determining a defendant's duty, is a matter of law for the court to decide. That is correct, but it is a rule of limited application. All it means is that, as a general matter, if the type of harm alleged is too remote a consequence of the type of misconduct alleged, the defendant is not liable. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) It is much the same as saying that the conduct, as a matter of law, was not the

---

[3]Nothing in *Ann M.*, *supra*, 6 Cal.4th 666, is to the contrary. The question presented in *Ann M.* was narrow: whether a shopping center had a duty, despite a lack of knowledge of prior incidents of violent crime, to provide security guards to protect a tenant's employee—or as stated in *Ann M.*'s own language, whether it "had reasonable cause to anticipate that criminal conduct such as rape would occur in the shopping center premises unless it provided security patrols in the common areas." (*Id.* at p. 676.) We concluded that because of the high cost of security guards and the difficulty of knowing how many might be needed, "a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards." (*Id.* at p. 679.) The "requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (*Ibid.*)

But that is the extent of *Ann M.* As the Court of Appeal herein explained, "*Ann M.* did not totally rewrite *Isaacs* on the issue of prior similar incidents, but only addressed that issue vis-à-vis the claimed necessity of a specific preventative measure: security guards." (Italics deleted.) What *Ann M.* does require is what *Isaacs* v. *Huntington Memorial Hospital*, *supra*, 38 Cal.3d 112, required: as stated, "a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M.*, *supra*, 6 Cal.4th 666, 679; cf. *Isaacs*, *supra*, 38 Cal.3d 112, 125, 131.) A court engages in that balancing test in determining the scope of the land possessor's duty. (*Ann M.*, *supra*, 6 Cal.4th at pp. 678-679.)

proximate cause of the harm. But there is no question of such remoteness here. It is for the jury to decide whether, under the facts of this case, the harm to Sharon P. was a foreseeable consequence of defendants' conduct.

The majority appear not to perceive the distinction, but they need look no further than *Ballard* v. *Uribe, supra,* 41 Cal.3d 564. *Brewer* v. *Teano, supra,* 40 Cal.App.4th 1024, usefully summarized *Ballard*'s holding. *Ballard* "acknowledged the confusion that had arisen over the respective roles played by the court and jury in dealing with the foreseeability concept in tort doctrine. In some contexts it is a question of fact for the jury, and in others a 'part of the calculus to which a court looks in defining the boundaries of "duty." ' ' "[D]uty" is not an immutable fact of nature, " 'but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " ' The foreseeability of a particular kind of harm is significant in the duty calculus, 'but a court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.' By contrast, the jury considers foreseeability in two more focused, fact-specific settings: likelihood or foreseeability of injury in deciding whether defendant's conduct was negligent in the first place, and whether the negligence was a proximate or legal cause of plaintiff's injury." (*Id.* at p. 1030.)

## C

Today's decision illustrates the impossibility of evaluating complex factual matters in the pages of the appellate reports. If the question of legal duty must not be "left to the jury," lest "the court . . . abdicat[e] decision in favor of men who do not know the law" (Prosser, *Proximate Cause in California* (1950) 38 Cal. L.Rev. 369, 423), so the questions of proximate cause and foreseeability in the fact-specific context of this case must not be left to a reviewing court that, in the absence of a full trial, cannot and does not know all of the relevant facts.

## II

I also disagree with the majority's unsupported comments about crime and public safety.

Apparently addressing the question of proximate cause, the majority announce that "it is questionable whether plaintiff's proposed measures

would have been effective to protect against the type of violent assault that occurred here. The record, for instance, contains no evidence that the security camera at issue was even aimed toward the area of the parking garage where plaintiff was attacked. Moreover, surveillance cameras do not deter all crime and criminals do not confine their activities to locations that are untidy or unkempt." (Maj. opn., *ante*, at p. 1196.)

Of course surveillance cameras do not deter *all* crime. One question to be resolved at trial is the extent to which they would have on defendants' premises. And of course criminals do not confine their conduct *entirely* to neglected, dank, dark, gloomy and unmonitored underground parking structures. Crime may occur in unlikely places: in 1982 an intruder awakened Queen Elizabeth II in her bedroom at Buckingham Palace. The question, ultimately, is whether the environment in which plaintiff was assaulted invited crime in a way that entitles her to damages. These are questions of fact for a jury to resolve.

Casual theorizing and straw-figure demolition pervade the majority's discussion. The majority speculate that "surveillance cameras may be ineffectual to protect against crime unless there are employees who are available to continuously monitor video transmissions and respond effectively when suspicious or criminal behavior is observed." (Maj. opn., *ante*, at p. 1196.) They also, with notable lack of persuasiveness, question the efficacy of good lighting. (*Id.* at pp. 1196-1197.) But at a trial, there might be testimony on such questions. That trial will not occur now.

One item of the majority's social commentary is almost certainly incorrect. They justify their decision to excuse defendants in part by announcing that "violent crime [is] 'endemic in today's society.' " (Maj. opn., *ante*, at p. 1194.) The strange implication is that ever higher crime rates justify a new legal rule. But empirical data belie the majority's observation: violent crime has declined to the levels of decades ago. "National Crime Victimization Survey [1998] violent crime rates . . . are the lowest recorded since the survey's inception in 1973."[4] And "the 1991 peak in the homicide rate was lower than the 1980 crest and even close to par with trends during the Great

---

[4]Bureau of Justice Statistics, United States Department of Justice, Criminal Victimization 1998 (Aug. 25, 1999) page 1 <http://www.ojp.usdoj.gov/bjs/abstract/cv98.htm> (as of September 21, 1999).

Depression. Moreover, since 1991, the murder rate has regressed to levels not seen since the 1960s."[5]

Moreover, the majority's crime prevalance analysis is illogical. If crime is endemic in a particular area, then the duty to protect against it is heightened, not diminished. The relevant question in this regard is whether defendants' garage was located in an area sufficiently prone to certain crimes so as to make a potential attack on an invitee foreseeable. If so, that fact, regardless of statistics, would call for defendants to provide more protection to their invitees, not less. To repeat, " 'foreseeability . . . includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' " (*Bigbee* v. *Pacific Tel. & Tel. Co.*, *supra*, 34 Cal.3d 49, 57.)

## III

The Court of Appeal declared that this case presented the question whether underground "commercial parking garages can be fairly characterized as inherently dangerous" for attracting "the criminal acts of third persons." It held that they could be so characterized.

In reversing the trial court's grant of summary judgment, the Court of Appeal found two factors significant. The first was narrow and, though it led that court to a legal conclusion, was fact specific. Sharon P. alleged that defendants had neglected the property and it was located in a high-crime area. "[T]aking into account the physical conditions presented at this particular location as well as its recent history of criminal activity, including at least seven serious felonies (robberies) at the adjacent bank premises during the two-year period preceding the assault on plaintiff, we hold, as a matter of law, that a high degree of foreseeability existed that patrons of the defendants' commercial parking garage might become victims of third person criminal assaults, such as robberies, shootings, rapes, or some other form of physical aggression. We necessarily further hold that, given all of such circumstances, specific evidence of prior similar criminal misconduct is not required in order for the defendants to have a duty to provide reasonable preventative measures which, depending on the total circumstances, might or might not include security guards." (Italics omitted.)

The second factor in the Court of Appeal's analysis was purely legal: it held that as a matter of law underground parking garages, by their nature,

---

[5]Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics (1998) Section 3, Nature and Distribution of Known Offenses <http://www.albany.edu/sourcebook/1995/sec3intro.html> (as of September 21, 1999).

invite crime. " '[I]n its very operation of a parking structure, defendant may be said to have created "an especial temptation and opportunity for criminal misconduct," thus increasing the foreseeability of the attack. [Citation.] In making this observation, we note the unique nature of a parking complex, which invites acts of theft and vandalism. In such structures, numerous tempting targets (car stereos, car contents, the cars themselves) are displayed for the thief; high walls, low ceilings and the absence of the cars' owners allow the thief or vandal to work in privacy and give him time to complete his task. Such circumstances *increase* the likelihood of criminal misconduct. In addition, the deserted, labyrinthine nature of these structures, especially at night, makes them likely places for robbers and rapists to lie in wait. Robbery, rape, and violent consequences to anyone who interrupts these crimes, may thus also be foreseeable.' " The Court of Appeal was quoting *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 628 [193 Cal.Rptr. 600], invoking language that we also quoted approvingly in *Isaacs* v. *Huntington Memorial Hospital*, *supra*, 38 Cal.3d 112, 128.

These conclusions were, in my view, erroneous. The first conclusion was incorrect for the same reason that the majority err: the Court of Appeal decided as a matter of law a question of foreseeability that was for the jury, but decided it to the contrary. The second conclusion, that subsurface parking garages are inherently dangerous, was also erroneous. In fact some such parking garages, because they provide the security their location requires, are not dangerous. But the Court of Appeal cannot be faulted for having addressed the issue. It was inevitable that a reviewing court would do so after we queried an aside in *Ann M.*, *supra*, 6 Cal.4th 666, "whether some types of commercial property are so inherently dangerous that, even in the absence of prior similar incidents, providing security guards will fall within the scope of a landowner's duty of care." (*Id.* at p. 680, fn. 8.) We suggested that parking garages were inherently dangerous, observing that Ann M. had "offered no evidence to show that, like a parking garage or an all-night convenience store, a retail store located in a shopping center creates ' "an especial temptation and opportunity for criminal conduct." ' " (*Ibid.*) The Court of Appeal noted, "Although the [*Ann M.*] court phrased the question only in terms of a duty to provide security guards, the basic issue it left unresolved is whether certain types of commercial premises may be so inherently dangerous as to present a reasonable foreseeability that crimes against customers or tenants will be committed by third persons if the landowner does not take reasonable preventative measures which may or may not include security guards."

But the majority have responded to the questionable aspects of the Court of Appeal majority's analysis with their own errors. I disagree with the reasoning both of the majority on this court and that on the Court of Appeal.

## IV

I would affirm the judgment of the Court of Appeal, but on the grounds stated herein.