94 Cal.Rptr.2d 268 (2000)
79 Cal.App.4th 741
Bertha VALENCIA, a Minor, etc., et al., Plaintiffs and Appellants,
v.
Terry MICHAUD et al., Defendants and Respondents. Juana Nunez, Plaintiff and Appellant,
v.
Terry Michaud et al., Defendants and Respondents.
No. A083888.
Court of Appeal, First District, Division Three.
March 31, 2000.
As Modified on Denial of Rehearing April 25, 2000.
Review Denied July 12, 2000.[*]
*271 Steven J. Bell, San Francisco, Edward J. Niland, Jr., Saratoga, for Appellants.
Brian S. Kreger, Lamberto & Kreger, for Respondents.
WALKER, J.
In this opinion we seek to clarify an area that continues to generate confusion among trial and appellate courts. That is, how are the courts to analyze the question of duty in a negligence action brought by a tenant against a landlord, for injuries inflicted by a third party on the landlord's premises? In the case before us, Bertha Valencia (Bertha), a minor, was violently attacked and injured by Eric Umali (Eric), the adult son of Ricardo and Erlinda Umali who were tenants in the apartment building where Bertha's family also resided. At the time of the attack, Bertha lived with her mother Eva Nunez (Eva) and her aunt Juana Nunez (Juana), in the same apartment complex and on the same floor as the Umalis. As a result of the attack, Bertha, Eva and Juana sued the Umalis, as well as persons and entities alleged to be the owners and landlords of their apartment building (landlords), where the attack took place.[1]
The landlords successfully moved for summary judgment on the ground that they owed no legal duty to the plaintiffs to protect them from injury. The plaintiffs appeal, claiming that they presented evidence to establish the landlords' duty to take steps to remove Eric, an unauthorized guest in the building, in order to protect them from a foreseeable danger, and that triable issues of material fact remain as to breach, causation and damages. We hold that summary judgment was erroneously granted as against Bertha, because the evidence established that the landlords were in possession of sufficient information about Eric to make his conduct foreseeable to a reasonably prudent landlord, thereby creating a duty upon them to exercise reasonable care in making an effort to remove Eric from the property. As against Eva's and Juana's individual claims for negligent infliction of emotional distress, we affirm the granting of summary judgment, as they presented no evidence to show that they were percipient witnesses to the attack.

Facts and Procedural History
In July of 1996 nine-year-old Bertha lived with her mother, her aunt, and other *272 relatives in an apartment on the second floor of 1735 Broadway Avenue, Redwood City, a three-story, thirty-three-unit apartment building. At that time, Eric was staying with his parents who lived in an apartment on the same floor as Bertha and her family. Eric's parents and sister were the only named tenants on the apartment lease, which allowed three residents in the apartment. On July 19, 1996, in the apartment building's second floor hallway, Eric repeatedly stabbed Bertha with a large knife. At the time of the stabbing Eva and Juana were inside their apartment. Eva heard a scream, then a knock on the door, which Juana answered. A neighbor told Juana that Bertha was "full of blood." Juana ran down the hall and Eva stayed by the door; Eva soon saw Eric's father carrying Bertha, who was covered with deep cuts and blood.
Bertha, Eva and Juana sued the Umalis and those alleged to be landlords of the apartment building. As against the landlords, Bertha proceeded on a theory of premises liability, claiming that they were negligent because they "knew, or should have known, that ERIC UMALI, who was the son of a tenant ... and was an unauthorized tenant on said premises, was dangerous, violent and was stalking the plaintiff ..., but failed to provide adequate security measures to avoid injury to tenants of said apartment complex, including, but not limited to evicting said ERIC UMALI from the premises...." Eva and Juana sought damages from the landlords for negligent infliction of emotion distress, alleging that they were in close proximity to Bertha when she was attacked, and personally witnessed the incident and Bertha's injuries, resulting in their emotional distress.
The landlords moved for summary judgment, claiming they had no duty to the plaintiffs because the attack on Bertha was not foreseeable as Eric had not previously committed any violent acts on the premises and they had no knowledge of any violent propensities on his part. In support of their motion, the landlords presented the declaration of Michaud, the managing partner of Grubstake Properties III, which owned the apartment building. Michaud stated that prior to the attack on Bertha he had no knowledge of any violent tendencies or previous violent conduct on the part of Eric, he did not know that Eric posed a danger to anyone in the apartment building, he did not know about any of Eric's prior criminal acts, and he did not know that Eric had made any threats or conducted himself in a way that suggested he posed a danger to any of the other tenants. In addition, landlords presented portions of Eva's deposition, in which she testified that she and her sister Juana were inside their apartment at the time of the stabbing.
In opposing the summary judgment motion, the plaintiffs contended landlords knew enough about Eric to make his attack on Bertha foreseeable, thereby imposing upon them a duty to take steps to remove him from the premises. To support their claim, plaintiffs submitted Eva's declaration and deposition excerpts in which she stated that she had complained about Eric to the apartment manager, Mary Batres (Batres). Specifically, Eva stated that she had made four complaints, the first one four months before the attack, and the last one about two weeks prior to the attack. The nature of these complaints were twofold. The first two times, she complained that Eric was walking the halls day and night giving her "ugly" looks, and that she was scared of him. Batres told her not to worry, that he was just a nervous person, and that she would speak to his parents to find out when he would be leaving, as he was only visiting them. Eva complained to Batres a third time after Eric, who she saw through the peephole, tried turning the doorknob on the locked front door to her apartment. This time Batres told her that she had spoken to Eric's parents and had found out that he was only there on vacation and would be leaving soon. On this occasion *273 Batres also told Eva that she had informed the owners of the apartment of Eva's complaints. And, on the fourth occasion, Eva again complained to Batres that she and her family were afraid of Eric, and asked why he had not left yet. Again, she was told not to worry because Eric was a quiet man who walked the halls because he was nervous, but that nothing would happen to them.
In opposing the summary judgment motion plaintiffs also asserted that Eric was an unauthorized guest in the building. They presented evidence that Eric was not a named lessee on the lease for the apartment where he was staying; that the lease naming Eric's parents and sister as tenants limited to three the number of occupants allowed as residents; that allowing guests to stay more than three days without written consent constituted a violation of the rental agreement; that no such written consent had been obtained for Eric; that it was the landlords' policy to give tenants a notice to vacate when they violated the agreement's occupancy limits; that the landlords had on previous occasions terminated the tenancy of tenants who exceeded the permissible occupancy limits; that they had also previously asked the guests of tenants to leave the premises if they were creating a nuisance, and had called the police if the guests did not leave when asked.
Finally, plaintiffs presented the declaration of Dennis Dalton, an expert in security premises liability.[2] Dalton stated that under the circumstances and the facts concerning Eric's conduct, the standard of care required Batres to immediately remove Eric from the premises, and to call the police if he did not leave. In addition, Dalton was of the opinion that after Eva complained about Eric the landlords should have sought to remove him from the premises by enforcing the lease provisions allowing only three tenants. These assertions were set forth in plaintiffs' separate statement of undisputed facts with supporting evidence. In replying to plaintiffs' initial opposition, the landlords filed points and authorities, but no separate statement of material facts disputing any of the facts stated by plaintiffs in declarations and depositions and contained in their separate statements of undisputed facts.
In a supplemental filing, made after the trial court granted plaintiffs a continuance, the plaintiffs provided excerpts from the deposition of Batres. At deposition, Batres testified that before the stabbing she had investigated the cost of obtaining security services for the apartment building to alleviate various problems she had been having such as vandalism to cars parked outside, homeless people sleeping underneath the stairways, people urinating around the building, people writing on the walls, parties she could not control, and people having sex behind the building. She testified that she expressed these concerns to Michaud, but received no response. Plaintiffs also submitted the unsigned declaration of Carlos Hernandez,[3] a resident in the apartment building who declared that he frequently saw Eric walking the halls very late at night, "acting strange." Eric's behavior made Hernandez concerned for his safety and for the safety of others. He twice talked to Batres about his concerns and she advised him that she was taking care of the problem. Before the stabbing, he also noticed other problems in the building, such as *274 homeless people using drugs and sleeping in the hallways and common staircases. He spoke to Batres's husband about the problem, and they agreed that additional security, including the use of cameras, would help control the problems. Hernandez stated that several days later Batres's husband told him that Michaud did not want to spend the money necessary for the suggested security measures.
After hearing, the trial court granted landlords' motion for summary judgment on the ground that there were "no material disputed facts that defendants knew of any violent or dangerous propensity on the part of Eric Umali and that it was not reasonably foreseeable that Mr. Umali would commit the act." Plaintiffs' subsequent motion for new trial was denied, and this timely appeal followed.

Discussion

Premises Liability
Plaintiffs have asserted that the landlords were negligent in failing to take steps to remove Eric from the premises, resulting in their injuries. In order to prevail on their negligence claims, the plaintiffs must establish that the landlords owed them a legal duty, that this duty was breached, that the breach was the legal cause of their injuries and that they suffered damages. (Shamn P. v. Annan, Ltd. (1999) 21 Cal.4th 1181, 1188, 91 Cal. Rptr.2d 35, 989 P.2d 121 (Sharon P.); 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 537, p. 624.) The landlords prevailed on summary judgment by convincing the trial judge that plaintiffs could not establish the first of these required elements, that is, that as a matter of law, under the facts, no duty existed on the part of the landlords toward the plaintiffs. We review the record de novo to determine whether the landlords either conclusively negated this necessary element of the plaintiffs' case or demonstrated that under no hypothesis did there exist a material issue of fact requiring a trial. (Ann M., supra, 6 Cal.4th at pp. 673-674, 25 Cal.Rptr.2d 137, 863 P.2d 207.)
We thus concern ourselves with the question of the duty owed to the plaintiffs. It has been repeatedly stated that the existence of duty is a question of law to be decided by the court. (See, e.g., Sharon P., supra, 21 Cal.4th at p. 1188, 91 Cal. Rptr.2d 35, 989 P.2d 121.) It has nearly as often been said that landowners in California have a duty to maintain property that is in their possession and control in a reasonably safe condition. (Rowland v. Christian (1968) 69 Cal.2d 108, 119, 70 Cal.Rptr. 97, 443 P.2d 561 (Rowland).) If it is a foregone conclusion that landowners have a duty to exercise reasonable care to maintain their property in a safe condition, then what is the question of law regarding the existence of the landlord's duty, so regularly left to the courts? The question has perplexed many a court, leading to a confused body of law. We seek to answer the question clearly. To do so, we will first step back from the precise question presented here, to consider the question of duty in the broader context of tort law. To aid us in our overview of the subject, we look to Prosser and Keeton on Torts (5th ed.1984).
The law of torts "is concerned with the allocation of losses arising out of human activities.... `... The purpose of the law of torts is to adjust these losses, and to afford compensation for injuries sustained by one person as the result of the conduct of another.'" (Prosser & Keeton on Torts, supra, § 1, p. 6.) When a defendant has not intended to interfere with a plaintiffs rights, and society has not deemed a defendant to be strictly liable for a plaintiffs injuries regardless of fault, liability will be determined under a negligence theory. (See id. at § 7, pp. 31-32.)
As we have stated, the elements of negligence are: (1) defendant's duty to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a breach of the duty by *275 failure to conform to that standard; (3) a causal connection between the defendant's conduct and resulting injuries; and (4) actual loss or damages. (Prosser & Keeton on Torts, supra, § 30, pp. 164-165.) To determine the standard of conduct required by the first element we generally undertake a risk-benefit analysis "by balancing the risk, in the light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect, and the expedience of the course pursued. For this reason, it is usually very difficult, and often simply not possible, to reduce negligence to any definite rules; it is `relative to the need and the occasion,' and conduct which would be proper under some circumstances becomes negligence under others." (Id. at § 31, p. 173.)
Put another way, "`duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the sameto conform to the legal standard of reasonable conduct in the light of the apparent risk." (Prosser & Keeton on Torts, supra, § 53, p. 356.) Thus, for example, the law imposes upon the driver of a car an obligation to drive with reasonable care for the safety of others. If the driver fails to use reasonable care and injures another, he or she will be held liable. Of course, the question of what is reasonable will depend in each case upon the particular circumstances facing that driver, such as the foreseeability of the risk of harm, balanced against the extent of the burden of eliminating or mitigating that risk.
We have undertaken this brief and admittedly incomplete review of negligence law to bring into focus the threshold question present in every negligence action: How do we define the scope of the defendant's duty established by law for the protection of others against an unreasonable risk? Out of this, the law of negligence in the landlord-tenant context has evolved to impose a duty of reasonable care upon the owner of an apartment building to protect its tenants from foreseeable third party criminal assaults. The question of a landlord's duty, therefore, is not whether a duty exists at all, but rather, what, given the circumstances, constitutes reasonable care? That is, what is the scope or extent of the landlord's duty given the particular facts of the case? When we refer to the scope of the landlord's duty, we are talking about what steps, specifically, a landlord must take in a given specific circumstance to maintain the property's safety and protect a tenant from a specific type of harm. It is this question that we decide as a matter of law.[4]
In answering the question, we look first to the steps the plaintiff claims the landlord had a duty to undertake. These assertions set the boundaries for our inquiry. Thus, in Ann M. and Sharon P. the Supreme Court considered whether, as alleged by the plaintiffs, the scope of the duty owed by owners of a shopping center and a commercial parking garage extended to providing security guards to protect its tenants and customers from violent crimes. (Ann M., supra, 6 Cal.4th at p. 670, 25 Cal.Rptr.2d 137, 863 P.2d 207; Sharon P., supra, 21 Cal.4th at pp. 1188-1189, 91 Cal.Rptr.2d 35, 989 P.2d 121.)
Once the scope of the duty under consideration is established, we can undertake a balancing analysis of the risks and benefits present in a given case. The factors to be weighed will vary with each case, but a review of the cases addressing the question of duty in the landlord-tenant context reveals two primary considerations: the foreseeability of the harm and the extent of burden on the landlord to *276 protect from the harm.[5] We again look to Ann M. and Sharon P., where the Supreme Court determined whether the scope of the landlords' duties extended to providing security guards by deciding the degree to which the attacks were foreseeable in light of the circumstances, as weighed against the extent of the burden to the defendants of taking the security measures urged by the plaintiffs. "`"[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]'" (Ann M., supra, 6 Cal.4th at pp. 678-679, 25 Cal.Rptr.2d 137, 863 P.2d 207, quoting Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 125, 211 Cal.Rptr. 356, 695 P.2d 653 (Isaacs).)
In Ann M. the Supreme Court determined that the plaintiff had failed to establish the degree of foreseeability necessary to require the type of security measures requested. The plaintiff, employed by one of the tenants in defendants' commercial shopping center, was raped and robbed at knife point in the store where she worked. (Ann M., supra, 6 Cal.4th at pp. 670-671, 25 Cal.Rptr.2d 137, 863 P.2d 207.) She sued the landlords for negligence. In deciding that violent criminal assaults were not sufficiently foreseeable to impose a duty on the defendants to provide security guards in common areas, the court noted that there was no evidence that defendants had notice of prior similar incidents occurring on the premises, that evidence of other criminal conduct on the premises was not similar in nature to the violent assault suffered by plaintiff, and that neither evidence of the crime rate in the surrounding neighborhood nor evidence that transients were present on the premises was sufficient to establish a high degree of foreseeability. (Id. at pp. 679-680, 25 Cal.Rptr.2d 137, 863 P.2d 207.) Given its conclusion that the monetary and social burdens of hiring of security guards were neither minimal nor insignificant, the court held that a high degree of foreseeability was required, which could "rarely, if ever, ... be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (Id. at p. 679, 25 Cal. Rptr.2d 137, 863 P.2d 207.)
Similarly, in Sharon P. the court declined to impose a duty on the defendant landlords to provide security guards in their underground commercial parking garage because the sexual assault on the plaintiff was not foreseeable. Although there was evidence that the bank on the first floor of the building had been robbed 7 times in the prior 27-month period, that several hundred crimes including 2 rapes had occurred in the 50 square blocks surrounding the building, and that persons were known to have slept and urinated in or around the garage prior to the assault on plaintiff, no crimes had been reported in the garage in the 10 years preceding the attack. (Sharon P., supra, 21 Cal.4th at pp. 1186, 1191, 1194-1195, 91 Cal.Rptr.2d 35, 989 P.2d 121.) The court found it significant that none of the bank robberies had involved violent attacks, and held that *277 their dissimilarity to the sexual assault on the plaintiff, even when considered with the other evidence, did not establish the high degree of foreseeability necessary to justify the "significant burden" (id. at p. 1195, 91 Cal.Rptr.2d 35, 989 P.2d 121) of imposing a duty to provide security guards in the garage. (Id. at p. 1191, 91 Cal. Rptr.2d 35, 989 P.2d 121.)
Sharon P. made an alternate argument that even if the landlords were not required to hire security guards because a high degree of foreseeability could not be established, they were still required to provide protection by "simple and less burdensome means" such as improving lighting and cleanliness, hooking up an already installed security camera over the elevator, and requiring existing personnel to walk through the garage periodically, because it was foreseeable that there would be violent third party crimes in underground garages. (Sharon P., supra, 21 Cal.4th at pp. 1195-1196, 91 Cal.Rptr.2d 35, 989 P.2d 121.) The Supreme Court rejected the claim, again asserting the record's deficiency in establishing the foreseeability of violent attacks such as the one suffered by the plaintiff, but also concluding that the proposed alternate measures were vague and impossible to define, were of questionable efficacy, and were not necessarily less burdensome than the hiring of security guards. (Id. at p. 1196, 91 Cal.Rptr.2d 35, 989 P.2d 121.)
Numerous other cases have decided the question of a landlord's liability for a tenant's injuries by considering the foreseeability of injury as balanced against the burden of protecting against the injury.[6] In Gomez v. Ticor (1983) 145 Cal.App.3d 622, 193 Cal.Rptr. 600, plaintiffs' decedent was killed in a parking garage when he interrupted a robbery in progress. In reversing summary judgment for the owner of the parking structure, the court noted the history of theft and vandalism in the garage, and concluded that it was at least somewhat foreseeable that a garage patron would interrupt such an act and be subject to a violent attack by the perpetrator. As balanced against the burden of providing a "`first line of defense'" against intruders, which the court did not precisely define but concluded was minimal and did "not place an onerous burden upon defendant or society," the court held defendant had a duty to implement those minimal measures. (Id. at pp. 632-633, 193 Cal.Rptr. 600.)
In 7735 Hollywood Blvd. Venture v. Superior Court (1981) 116 Cal.App.3d 901, 172 Cal.Rptr. 528, plaintiff was raped in her apartment and sued her landlord, claiming that it had a duty to provide lighting and security devices sufficient to prevent the attack. The court rejected the claim, on the ground that plaintiff had not alleged sufficient foreseeability of the attack to justify the vague and onerous duty she sought to impose on the defendant. (Id. at p. 905, 172 Cal.Rptr. 528.)
In Rogers v. Jones (1976) 56 Cal.App.3d 346, 128 Cal.Rptr. 404, the court refused to *278 impose a duty on a football stadium parking lot operator to prevent an attack by one fan upon another. The court held that the measures needed to prevent such an incident would be unreasonably burdensome, necessitating that one guard be provided for every fan. It concluded that the harm to the plaintiff was not sufficiently foreseeable to warrant such a heavy burden. (Id. at p. 352, 128 Cal.Rptr. 404.)
In Pamela W. v. Millsom (1994) 25 Cal. App.4th 950, 30 Cal.Rptr.2d 690 (Pamela W.), the plaintiff was raped by an intruder into her condominium, one of four in the condominium complex. During the rape, the assailant called Pamela by name, and told her that he had been watching her. She sued her landlords alleging negligence, and they obtained summary judgment on the ground that they owed her no duty, as the attack was not reasonably foreseeable in the absence of prior similar incidents on the premises. (Id. at pp. 953-955, 30 Cal.Rptr.2d 690.) On appeal, the court undertook an analysis of the landlords' duty in light of Ann M., and affirmed, concluding that the rape was not sufficiently foreseeable to impose the extraordinarily burdensome duty upon the defendants to physically secure the premises in the manner demanded by the plaintiff. (Pamela W., supra, at p. 959, 30 Cal.Rptr.2d 690.)
By contrast, in Kwaitkowski v. Superior Trading Co. (1981) 123 Cal.App.3d 324, 176 Cal.Rptr. 494, plaintiff was raped in a common area in her apartment building, and sued the landlord, alleging that the lock to the common hallway was broken and that a robbery had previously occurred in the same hallway. The court held that the burden of fixing the lock on the lobby door placed the landlord under such a minimal burden that the slight foreseeability of the rape engendered by the prior robbery in the same location was sufficient to impose a duty on the landlord to provide the "first line of defense" against intruders by providing working locks. (Id. at p. 333, 176 Cal.Rptr. 494.)
Although these cases have resolved as a matter of law the question of the scope of the landlord's duty, often by engaging in an implicit balancing process, they have not been uniformly clear on the method utilized to reach their conclusion. We now set forth a workable method, which can be harmonized with the outcome of the cases that have preceded this one.
As a first step in the analysis the court must determine the measures that the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Next, the court must analyze how burdensome these proposed measures are to the landlord, both financially and socially. On a continuum from minimally to significantly burdensome, where does the proposed scope fall?[7] The third step is to identify the nature of the third party conduct that plaintiff claims could have been prevented had the landlord taken the proposed measures. Given the facts of the case, on a continuum from a mere possibility to a reasonable probability, how foreseeable was it that this type of conduct would take place? Once the burden and foreseeability have been independently measured, they can be weighed together in determining the scope or extent of the duty which the court is willing to impose on a given defendant. The more certain the likelihood of harm, the higher the burden we will impose to prevent it; the less foreseeable the harm, the lower the burden we will place on a landlord. And finally, where appropriate to the case, other mitigating or aggravating factors may be taken into account in the weighing process, such as those set forth in Rowland, *279 supra, 69 Cal.2d at page 113, 70 Cal.Rptr. 97, 443 P.2d 561. (See fn. 5, ante.)
The trial court here granted summary judgment for landlords after concluding that they "did not owe plaintiffs a legal duty" because they had no knowledge of facts to suggest that Eric had violent propensities, such that "it was not reasonably foreseeable that" he would violently attack Bertha. Applying the analytical approach we have set forth above, we review de novo the trial court's order granting summary judgment for the landlords.
Preliminarily, we consider the specific duty the plaintiffs seek to impose upon the landlords. Although plaintiffs have, on occasion, claimed that security guards were needed to keep the tenants safe and to control problems such as transients sleeping and using drugs in the common areas, they have more rigorously proposed both on summary judgment and on appeal, that the landlords had a duty to attempt to remove Eric from the premises. This claim frames for us the scope of the duty that, as a matter of law, we impose or not. The question we are therefore called upon to answer is this: Did the landlords owe plaintiffs a duty to exercise reasonable care in making an effort to remove Eric from the building?
To answer this question we first evaluate the extent of the burden that would be placed upon the landlords if required to take the requested steps. Plaintiffs point to the undisputed evidence that Eric was an unauthorized guest on the premises; that the landlords had a policy and practice of asking unauthorized guests to leave and calling the police if they did not; that Eric's parents' lease limited residency to three people and landlords also had a policy of terminating the tenancy of those tenants in violation of the lease agreement; and that Eric unlawfully attempted to enter another tenant's apartment. Given these undisputed facts, plaintiffs argue that their proposed preventive measures, such as asking Eric to leave because he was a guest who had stayed longer than three days without the landlord's consent, evicting the Umalis for violating the terms of their lease, or calling the police to report Eric's unlawful behavior, are minimally burdensome justifying the imposition of the duty upon the landlords.
Landlords respond that the duty plaintiffs seek to impose upon them would be enormous and inappropriate, forcing them to refuse to rent apartments to any applicant appearing the least bit unusual or odd, and requiring them to remove from the premises any tenants who behaved strangely, whether they have demonstrated violent propensities or not.
We conclude that under the facts presented, the burden sought to be imposed on the landlords was minimal. The undisputed evidence was that Eric was an unauthorized guest on the premises. The landlords admitted that their policy and practice was to ask unauthorized guests to leave and to call the police if they refused. There was also evidence that Eric's parents' lease limited residency to three people, that more than three people were living in the apartment during the period before the attack, and that landlords also had a policy of terminating the tenancy of those tenants in violation of the lease agreement. Finally, there was evidence that landlords knew Eric had attempted to enter plaintiffs' apartment, which provided another justification for calling the police. On a continuum from minimally to significantly burdensome, the duty to take the steps that they had previously taken with other unauthorized guests or tenants in violation of their lease constituted a minimal burden.
As we have seen, where "`"the harm can be prevented by simple means, a lesser degree of foreseeability may be required."'" (Ann M., supra, 6 Cal.4th at p. 679, 25 Cal.Rptr.2d 137, 863 P.2d 207.) In light of the minimal burden to landlords to take the measures proposed by plaintiffs, we consider how foreseeable it was *280 that Eric would violently attack someone in the building. If the facts known to the landlords were sufficient to notify them of a slight likelihood that Eric would injure a resident, then they had a duty to take the minimally burdensome steps available to them to remove him from the premises. The evidence presented in support of and opposition to the summary judgment established that Eva complained to the apartment manager on four occasions, explaining that she feared Eric because of his strange behavior, which included wandering the hallways at all hours, giving her "ugly" looks, and attempting to enter her locked apartment. Another tenant, Carlos Hernandez, also frequently saw Eric walking the halls acting strangely. Eric's behavior made Hernandez very concerned for his safety and the safety of others in the building, so he also complained to the manager about the problem.
Landlords contend that because they had no knowledge of Eric's violent propensities, nor of his criminal background, they could not have foreseen that he would violently attack someone on the premises, and they therefore had no duty to prevent the attack. As we have explained, a high degree of foreseeability of the precise injury was not required to impose the minimally burdensome measures urged here. We hold that the evidence of Eric's strange behavior in the hallways late at night, his "ugly" looks at a tenant, his attempt to enter a tenant's apartment, and complaints from tenants that they were afraid of him and concerned for their safety would give a reasonable landlord in this same position sufficient information to foresee that something could happen to place another's safety in jeopardy. Accordingly, a duty existed on landlords' part to exercise reasonable care in making an effort to remove Eric from the premises and summary judgment should not have been granted on the premises liability claims.[8]

Negligent Infliction of Emotional Distress
Both Eva and Juana attempted to state causes of action for negligent infliction of emotional distress, alleging that they were in "close proximity" to Bertha and "personally witnessed" the attack. The undisputed evidence on summary judgment belied the claims. It established that both Eva and Juana were inside their apartment at the time of the attack, and did not learn of it until their neighbor knocked on their door and informed them of it. In order to prevail on their claims, Eva and Juana were required to present evidence that they contemporaneously observed the attack. (See Dillon v. Legg (1968) 68 Cal.2d 728, 740-741, 69 Cal.Rptr. 72, 441 P.2d 912.) They could not recover for emotional distress suffered upon their observation of Bertha's injuries after the attack. (Thing v. La Chusa (1989) 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814.) Summary judgment was properly granted as against Eva and Juana.

Conclusion and Disposition
We hold the trial court erred in finding that Eric's attack on Bertha was not reasonably foreseeable, and that the landlords owed no legal duty to plaintiffs. The scope of the duty proposed by plaintiffs was minimally burdensome to landlords so that the slight foreseeability of the attack was sufficient to impose upon landlords the duty to take steps to remove Eric from the apartment complex. We therefore reverse the summary judgment entered as against Bertha and remand for further proceedings. We affirm summary judgments against Eva and Juana, as they failed to present evidence to support their claims for negligent infliction of emotional distress or their claims that they were direct victims. Landlords/respondents shall pay costs on appeal.
CORRIGAN, Acting P.J., concurs.
*281 PARRILLI, J.
I concur in the judgment, but I would go no further than to hold that because the plaintiffs' opposition raised triable issues regarding the defendants' duty, the trial court erred in granting summary judgment. The majority's analysis of the duty issue may be sound, but it need not carry us to the conclusion that a duty was established on the facts developed in the summary judgment proceedings. While duty is a question for the court to determine, if it is not dispositive there is no need for either a trial court or an appellate court to make a definitive ruling on the issue. As the majority recognizes in footnote 8 (maj. op., p. 280, ante), further facts may be developed after remand. All that is necessary to resolve the issue before us at this point is to say the defendants failed to carry the burden of showing, as a matter of law, that the plaintiffs could not establish the element of duty. (Code Civ. Proa, § 437c, subds. (c) and (n).)
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] Two complaints were filed, one by Bertha and Eva, the other by Juana. By stipulation, the two actions were consolidated for all purposes. The complaints stated causes of action against Terry Michaud (Michaud) in his individual capacity and doing business as Heritage Realty, Heritage Realty Property Management and Grubstake Properties III. Also sued were 17 other individuals who were alleged to have "negligently owned, maintained, managed and operated" the apartment complex. Undisputed evidence later established that these 17 individuals were general partners of Grubstake Properties III, which owned the apartment complex where Bertha was attacked; and that Michaud was a general partner as well as the managing partner, and also was the sole owner of Heritage Realty, the apartment building's property manager.
[2] The landlords interposed an objection to this declaration. The trial court did not rule on the objection. Because counsel did not obtain a ruling on the objection, it is waived and is not preserved for appeal. (Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 670 fn. 1, 25 Cal.Rptr.2d 137, 863 P.2d 207, (Ann Al).) Thus, even if the objection appears to us meritorious, we must view the objectionable evidence as part of the record. (Ibid.)
[3] The landlords also interposed an objection to this unsigned declaration but failed to obtain a ruling on their objection. We consider the evidence. (See fn. 2, ante.)
[4] As Prosser and Keeton on Torts, supra, sections 41-43, pages 263-281 has pointed out, questions of foreseeability, which play an important role in establishing the legal scope or extent of duty, also come into play for the fact finder, in determining causation. We concern ourselves here only with the former question, which is one of law for the court.
[5] Some of the many factors that can be weighed in this balancing test were set forth in Rowland, supra, 69 Cal.2d at page 113, 70 Cal.Rptr. 97, 443 P.2d 561 and have been relegated to footnote status in many cases since, including this one. This does not suggest that these factors are irrelevant or anachronistic. Rather, one or more may apply in any given case to alter the balance in light of policy considerations. Aside from foreseeability and extent of burden to the defendant, which have evolved to become the primary factors considered in every case (see discussion, post), these factors include: "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the ... consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (Ibid.)
[6] Many of the cases addressing the issue have failed to draw the semantic distinction between the existence of a landlord's duty and the scope of that duty in a given factual situation. (See, e.g., Cohen v. Southland Corp. (1984) 157 Cal.App.3d 130, 203 Cal.Rptr. 572; Sturgeon v. Curnult (1994) 29 Cal.App.4th 301, 34 Cal.Rptr.2d 498; and Isaacs, supra, 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653.) In our opinion, this omission has led to confusion about the court's job in deciding, as a matter of law, the scope of the duty. Adding to the confusion is the fact that some of these same cases have not been explicit in weighing the burden that would be placed on the landlord if it was placed under a duty to conduct itself in the manner proposed by plaintiff as against the degree of foreseeability of the harm to the plaintiff. (See, e.g., Frances T. v. Village Green Owners Assn. (1986) 42 Cal.3d 490, 229 Cal.Rptr. 456, 723 P.2d 573; Sturgeon, supra, 29 Cal.App.4th 301, 34 Cal. Rptr.2d 498.) This is not to say that the cases were wrongly decided. In fact, they have decided the correct question (scope of duty) and balanced the risks and benefits (foreseeability and burden). Our criticism is only that they have not been precise or explicit in the language used to explain their decision, thereby rendering more difficult the trial courts' task. (See, e.g., Cohen, supra, 157 Cal.App.3d 130, 203 Cal.Rptr. 572.)
[7] Various case specific factors may come into play in making this determination, such as the size of the property in question. (See Pamela W., supra, 25 Cal.App.4th at p. 958, 30 Cal. Rptr.2d 690 [what is a minimal financial burden for owner of large apartment building may be a significant burden for owner of a smaller one].)
[8] We wish to be clear that our conclusion a duty exists is based on the facts that were presented in the parties' separate statements of material facts and left undisputed by the responses thereto. Nothing in this opinion should be understood to preclude the trial court from revisiting the issue based upon facts that may come before it on remand.